The NEW YORK CITY TRIATHLON, LLC, Plaintiff,

v.

NYC TRIATHLON CLUB, INC., Defendant.

No. 10 Civ. 1464(CM).

United States District Court, S.D. New York.

March 9, 2010.

Opinion Denying Motion to Vacate Preliminary Injunction May 4, 2010.

Peter A. Bicks, Lisa T. Simpson, Aaron G.R. Rubin, New York, NY, for Plaintiff The New York City Triathlon, LLC.

Christopher Vandaele, NYC Triathlon Club, New York, NY, for Defendant NYC Triathlon Club.

### DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

McMAHON, District Judge:

Plaintiff The New York City Triathlon, LLC has filed a motion for a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65, to prevent and restrain Defendant NYC Triathlon Club ("NYC Triathlon Club") from using "NYC Triathlon Club," "NYC Tri Club," and "New York City Triathlon Club" as names, trade names or trademarks, or as a domain name on the Internet, or in any other way that is likely to cause confusion with Plaintiff or its trade name and trademarks, NEW YORK CITY TRIATHLON, NYC TRIATHLON, and NYC TRI (the "NYC TRIATHLON Marks").

## Background

The NYC Triathlon is an Olympic distance triathlon, consisting of a 1500 meter swim in the Hudson River, a 40 kilometer bike ride up the West Side Highway and a ten kilometer run into Central Park. V. Compl. ¶ ¶ 7, 8; Korff Decl. ¶ 8. It has been run every summer in New York City since 2001 and Plaintiff has, since that date, exclusively used its name and mark THE NEW YORK CITY TRIATHLON (and its related variations, THE NYC TRIATHLON and THE NYC TRI) in connection with the event. V. Compl. ¶ ¶ 1, 35, 67; Korff Decl. ¶ 42. This year over 20,000 people vied for the 5600 entry spots, and they sold out in under seven minutes after registration opened online. V. Compl. ¶ 21; Korff Decl. ¶ 27. It is estimated that 250,000 people come out to watch the race. V. Compl. ¶ 21; Korff Decl. ¶ 11.

The race has developed a loyal and enthusiastic following. V. Compl. ¶ ¶ 20, 21, 34; Korff Decl. ¶¶ 27, 41. Thousands of participants have e-mailed John Korff, Plaintiff's principal owner and organizer of the race, to praise the race and to praise Plaintiffs organization and attention to detail. V. Compl. ¶ 34; Korff Decl. ¶ 41. To run a race of this scope and kind, Plaintiff must obtain approvals from over 40 different city and state agencies. V. Compl. ¶ 8; Korff Decl. ¶ 9. In addition, Plaintiff employs 200 people during the week of the race, hires countless additional independent contractors to handle everything from devising an emergency service plan, to building the entrance into and out of the Hudson River, to making plans for accommodating the many disabled athletes who participate, and also engages a team of 1000 volunteers to ensure the success of the race. V. Compl. ¶ 24; Korff Decl. ¶ 12. The NYC Triathlon is sanctioned by USA Triathlon ("USAT"), the independent organization that governs triathlon racing in the United States, and as such, adheres to certain safety guidelines and certifications. V. Compl. ¶ 9; Korff Decl. ¶ 10. The race attracts a diverse field of participants, ranging from elite racers to first time triathletes to physically disabled athletes. V. Compl. ¶ 24, 33; Korff Decl. ¶ 11.

The NYC Triathlon has been covered by numerous news and media outlets, including ABC, NBC, CBS, FOX, CNN, WOR, BBC, WFAN, *The New York Times, The Wall Street Journal, USA Today,* and the Associated Press. V. Compl. ¶ ¶ 14, 16; Korff Decl. ¶ ¶ 16, 20, 21, 22. It has received local coverage in nearly every U.S. State and has also received international media coverage in countries such as Australia, India, and Great Britain. V. Compl. ¶ ¶ 14, 16; Korff Decl. ¶ ¶ 20, 21. The event has been viewed by over 60 million people in the United States and over a billion worldwide. V. Compl. ¶ 14; Korff Decl. ¶ 16. Numerous well-known and famous brands have joined the team as sponsors of the event over the years. Nautica is currently the principal sponsor, and corporations such as Ford Motor Company, Marriott Hotels, Gatorade, JetBlue, Visa, Dasani, Delta Airlines, Accenture, News Corp. (which owns *The Wall Street Journal* and Fox Broadcasting Company), Toyota, and Janus Capital Group have all sponsored or currently sponsor the race. V. Compl. ¶ ¶ 13, 16; Korff Decl. ¶ ¶ 15, 26.

Defendant, SBR Multisports, Inc. ("SBR"), a retail outlet selling triathlon equipment, owned and operated by Defendant's principal owner, Christophe Vandaele ("Vandaele"), was a sponsor of the NYC Triathlon from 2005–2008 and took a booth at the race Expo in 2009. V. Compl. ¶ ¶ 39, 41; Korff Decl. ¶ 45. By press release dated January 25, 2010, Defendant announced that effective January 1, 2010, it was changing its name from "SBR

Triathlon Club" to "NYC Triathlon Club." V. Compl. ¶¶ 45, 56; Korff Decl. ¶ 52. Plaintiff sent Defendant a cease and desist letter dated January 8, 2010 seeking a response by January 15, 2010. V. Compl. ¶ 54; Korff Decl. ¶ 51. Defendant did not respond. Plaintiff commenced this action on February 22, 2010, seeking injunctive relief to protect its name mark and goodwill pursuant to Section 43(a) of the Lanham Act and the common and statutory laws of New York. V. Compl. ¶ 1.

### Standard for Obtaining a Preliminary Injunction

A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merit s, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.,* —— U.S. ——, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008). Irreparable injury must be "likely in the absence of an injunction"; it is not enough for a plaintiff to face some "possibility" of irreparable harm. *Id.* at 375. This is because a preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 376.

Notwithstanding the Supreme Court's decision in *Winter,* the Second Circuit has continued to allow parties to obtain a preliminary injunction either through: (1) "a likelihood of success on the merits"; or (2) "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Zino Davidoff SA v. CVS Corp.,* 571 F.3d 238, 242 (2d Cir.2009); *Faiveley Transport Malmo AB v. Wabtec Corp.,* 559 F.3d 110, 116 (2d Cir.2009). The Second Circuit also requires a "likelihood of irreparable inju-

ry" to the movant, but does not require any consideration of the public interest as part of the preliminary injunction standard. *Zino Davidoff SA,* 571 F.3d at 242.

The Court finds that Plaintiffs are entitled to a preliminary injunction under either standard.

### I. NYC TRIATHLON is Likely to Succeed on the Merits of Its Claims

The Verified Complaint sets forth seven counts arising out of Defendant's use of "NYC Triathlon Club" as a name and domain name: (1) trademark infringement, false designation of origin and unfair competition pursuant to section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)); (2) dilution pursuant to section 43(c) of the Lanham Act (15 U.S.C. § 1125(c)); (3) cybersquatting pursuant to section 43(d) of the Lanham Act (15 U.S.C. § 1125(d)); (4) common law trademark infringement under New York State law; (5) dilution pursuant to New York General Business Law § 360–1; (6) violation of New York General Business Law § 349, New York's deceptive acts and practices statute; and (7) unfair competition pursuant to the common law of New York.

Based upon the application of settled law to the undisputed facts, Plaintiff is likely to succeed on the merits of each of its claims.

### Lanham Act § 43(a) Claim

Section 43(a) of the Lanham Act expressly prohibits the use in commerce of any word, term, name, symbol, or device (or any false designation of origin) that is:

> likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . .

■ 15 U.S.C. § 1125(a)(1) and (a)(1)(A) (2009).[1] To state a claim under Section 43(a), a plaintiff must show it (1) has a valid trademark entitled to protection and (2) that the defendant's mark is likely to cause confusion in the marketplace. *See Virgin Enters. v. Nawab*, 335 F.3d 141, 146 (2d Cir.2003); *Heisman Trophy Trust v. Smack Apparel Co.*, 595 F.Supp.2d 320, 325 (S.D.N.Y.2009). The Second Circuit has articulated eight factors (often referred to as "the *Polaroid* factors") to be considered when assessing the likelihood of consumer confusion:

(1) the strength of the plaintiff's mark;

(2) the similarity of the plaintiff's and defendant's marks;

(3) the competitive proximity of the products or services;

(4) the likelihood that the plaintiff will "bridge the gap" and offer a product or service similar to the defendant's;

(5) actual confusion between the products or services;

(6) good faith on the defendant's part;

(7) the quality of the defendant's products or services; and

(8) the sophistication of buyers.

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir.1961), *cert. denied*, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). *See also Virgin Enters.*, 335 F.3d at 146–47; *Heisman Trophy*, 595 F.Supp.2d at 326. The factors apply to competing and non-competing goods and services, and no single factor is intended to be dispositive. *See Natural Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 578 (2d Cir.2005); *Fruit–Ices Corp. v. Coolbrands Int'l, Inc.*, 335 F.Supp.2d 412, 418–19 (S.D.N.Y.2004). Since the analysis used to determine the first prong of a claim under § 43(a)—whether a trademark is valid and entitled to protection—overlaps with the analysis generally used to assess the first *Polaroid* factor—*i.e.*, strength of the mark—the strength and protectability of Plaintiff's NYC TRIATHLON Marks are discussed together.

### 1. Validity and Strength of Plaintiff's Marks

■ Since the NYC TRIATHLON Marks fall into the descriptive category on the *Abercrombie* continuum,[2] they must have "secondary meaning," *i.e.*, the ability to signify Plaintiff as the exclusive source of the services at issue to an appreciable number of consumers, in order to be protectible. In determining whether a mark has acquired secondary meaning, the Second Circuit has set forth a number of factors that can be considered: 1) advertising expenditures; 2) sales success; 3) unsolicited media coverage of the product; 4) attempts to plagiarize the mark; 5) the length and exclusivity of the mark's use; and 6) consumer studies linking the name to a source. *See Thompson Med. Co. v. Pfizer, Inc.*, 753 F.2d 208, 217 (2d Cir.

---

**1.** Section 43(a) protects both registered and unregistered marks. *See Two Pesos v. Taco Cabana*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) ("[I]t is common ground that § 43(a) protects qualifying unregistered trademarks."); *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 128 n. 3 (2d Cir. 2009) (citing *Two Pesos* ); *DC Comics v. Kryptonite Corp.*, 336 F.Supp.2d 324, 331 (S.D.N.Y.2004) (citing Section 43(a) and noting that it "protects both registered and unregistered marks.").

**2.** The Second Circuit's *Abercrombie's* continuum to determine the validity of a mark finds at one end, fanciful and arbitrary marks such as KODAK and XEROX and at the other, generic terms, such as MILK for milk. Descriptive and suggestive marks fall in between those two extremes. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976)

1985); *see also Philip Morris USA Inc. v. Cowboy Cigarette Inc.*, No. 03 Civ. 2292(JSR), 2003 WL 22852243, at *2 (S.D.N.Y. Dec. 2, 2003); *Simon & Schuster Inc. v. Dove Audio, Inc.*, 970 F.Supp. 279, 294 (S.D.N.Y.1997). "[N]o single factor among the six is determinative, and every element need not be proved." *Simon & Schuster*, 970 F.Supp. at 295 (citations omitted).

The length and exclusivity of Plaintiff's use of the NYC TRIATHLON Marks compels a finding of secondary meaning here. This year the NYC Triathlon will celebrate its tenth anniversary as the only Olympic distance triathlon to be run in the rivers, streets, and parks of New York City. V. Compl. ¶ 7; Korff Decl. ¶ 27. During the NYC Triathlon's ten years of existence, Plaintiff has been the exclusive user of the NYC TRIATHLON Marks. V. Compl. ¶ 1; Korff Decl. ¶ 42. Plaintiff has also been extremely protective of the exclusivity and use of its marks, requiring all sponsors to seek its written approval before using the NYC TRIATHLON Marks on any goods, services, or literature they publish or distribute and policing unauthorized uses of its marks. V. Compl. ¶ 28; Korff Decl. ¶ 34. To further protect its exclusive rights to its marks, Plaintiff has filed trademark applications for its NYC TRIATHLON Marks within the United States Patent & Trademark Office. V. Compl. ¶ 38; Korff Decl. ¶ 43. Those applications are pending.

With respect to sales and financial success, the race regularly sells out within minutes of entry slots being made available online. V. Compl. ¶ 7. For the 2010 race, all 5,600 entry spots were gone in six minutes and 43 seconds, with over 20,000 people trying to enter the race. V. Compl. ¶ 21; Korff Decl. ¶ 27. The race has approximately 250,000 spectators. V. Compl. ¶ 21; Korff Decl. ¶ 11. Plaintiff grosses millions of dollars in revenue per year from entry sales. V. Compl. ¶ 30; Korff Decl. ¶ 38. According to Plaintiff, the NYC Triathlon's revenue from entry spot sales is 50% greater than the nation's second largest Olympic distance triathlon and ten times greater than any other race of its kind. V. Compl. ¶ 30; Korff Decl. ¶ 38. Plaintiff also receives significant revenue from a group of wellknown and established sponsors, such as Ford Motor Company, Nautica, Gatorade, JetBlue, Dasani, News Corp. (which owns the FOX Broadcasting Company and The Wall Street Journal), further evidencing the strength of the NYC TRIATHLON Marks. V. Compl. ¶ ¶ 13, 16; Korff Decl. ¶ ¶ 15, 26. According to Plaintiff, its sponsorship revenue from those sponsors is twenty times greater than the average Olympic distance triathlon, V. Compl. ¶ 30; Korff Decl. ¶ 38.

The strength of Plaintiff's Marks is further evidenced by the vast media coverage that the event receives. The USAT-sanctioned event has been covered on national and local television stations and networks such as CNN, NBC, CBS, ABC, FOX, SNY, the Outdoor Life Network (now known as Versus), New York City's local network affiliates, and the BBC; on radio stations such as WFAN and Z–100; in print publications such as the front page of The New York Times, The New York Post, USA Today, the Associated Press, and all major triathlon magazines; and on its own website, www.nyctri.com. V. Compl. ¶ ¶ 14, 15, 16; Korff Decl. ¶¶ 16, 17, 20, 21, 22. The event has received local coverage in nearly every U.S. state. V. Compl. ¶ 16; Korff Decl. ¶ 21. The NYC Triathlon is promoted by the race's sponsors, such as News Corp., the owner of the FOX Network and of The Wall Street Journal, and Reebok. V. Compl. ¶ ¶ 17, 29; Korff Decl. ¶ 36.

Plaintiff's apparent relentless attention to the participants and customer service also contributes significantly to the NYC TRIATHLON Marks' consumer recognition. After registration, Korff personally e-mails each registrant to welcome them to the race. Korff Decl. ¶ 28. The e-mails Korff receives, though, truly signify the Marks' goodwill and the secondary meaning they have earned. Thousands of people have e-mailed Plaintiff praising the race and Plaintiff as the source and organizer of the race, writing, for example, "I'm extremely proud to be associated with such a world class event" and "the NYC Triathlon, like the NYC Marathon, has become one of the great events that is recognized World Wide." V. Compl. ¶ 34. Plaintiff's staff also engages in a meticulous and time-consuming process of identifying the continually-changing and unlisted roster of the presidents of the approximately four hundred triathlon clubs registered with USA Triathlon ("USAT") (the official governing body of triathlon in the United States), and communicating with them so that those presidents and their clubs will know of the race and Plaintiff as the source of the race. V. Compl. ¶ 18; Korff Decl. ¶ 25.

Defendant's use of the NYC TRIATHLON Marks provides further evidence of their secondary meaning. *See Tri–Star Pictures, Inc. v. Unger,* 14 F.Supp.2d 339, 351 (S.D.N.Y.1998). Having sponsored the NYC Triathlon for several years, Defendant's principal, Vandaele, and his company SBR, were necessarily familiar with the success of Plaintiff's event. V. Compl. ¶ 41; Korff Decl. ¶ 45. By discontinuing his sponsorship relationship with the NYC Triathlon and renaming his club "NYC Triathlon Club" (so as to suggest some affiliation with Plaintiff), Vandaele was clearly attempting to trade on Plaintiff's goodwill. Korff Decl. ¶¶ 51, 52, 57. Defendant's misappropriation of Plaintiff's

name for his own club is a testament to Plaintiff's success and further proof of the secondary meaning in Plaintiff's Marks.

Given the great success of the NYC Triathlon, the extensive media coverage, and the strong reputation Plaintiff has developed among consumers, Plaintiff's NYC TRIATHLON Marks have most certainly obtained secondary meaning and can be considered strong marks. *GTFM, Inc. v. Solid Clothing Inc.,* 215 F.Supp.2d 273, 294 (S.D.N.Y.2002).

Given their strong secondary meaning, the NYC TRIATHLON Marks are valid trademarks deserving of protection, satisfying the first element of a claim under Section 43(a) of the Lanham Act, and strong marks, providing persuasive support for a finding of likely confusion under the first *Polaroid* factor. *See Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co., Ltd.,* No. 95 Civ. 4008(AGS), 1995 WL 528001, at *7 (S.D.N.Y. Sept. 6, 1995) (granting preliminary injunction and noting, "[t]he strength of a mark is among the most important factors in the *Polaroid*" analysis) (citation omitted); *T. Anthony, Ltd. v. Malletier,* No. 93 Civ. 6900(KC), 1993 WL 659682, at *3 (S.D.N.Y. Nov. 24, 1993) (same).

### 2. Similarity of Plaintiff's and Defendant's Marks

■ The similarity between Defendant's "NYC Triathlon Club" and the NYC TRIATHLON Marks is obvious. When assessing the similarity of two names or marks, courts "analyze the mark[s'] overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." *Malletier v. Burlington Coat Factory Warehouse Corp.,* 426 F.3d, 532, 537 (2d Cir.2005) (quotation omitted). "[M]arks

are considered similar when they are similar in appearance, sound, and meaning." *Clinique Labs., Inc. v. Dep Corp.*, 945 F.Supp. 547, 552 (S.D.N.Y.1996) (citation omitted).

The central and important part of each of the marks at issue is identical in appearance, sound, and meaning—the words "New York City Triathlon," "NYC Triathlon," and "NYC Tri." Defendant's addition of the word "Club" does not change the emphasis on "NYC Triathlon" (and its aforementioned derivations) as the operative part of the mark. In fact, the addition of the word "Club" suggests that Plaintiff has launched its own club in conjunction with its signature event. "It is the general rule that one may not appropriate the entire mark of another and avoid a likelihood of confusion by the addition thereto of descriptive or otherwise subordinate matter." *Bellbrook Dairies, Inc. v. Hawthorn–Mellody Farms Dairy, Inc.*, 45 C.C.P.A. 842, 253 F.2d 431, 432 (1958) ("Vita–Slim" confusingly similar to "Slim") (citations omitted); *see also A.T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 470 F.2d 689, 692 (2d Cir.1972) (finding addition of "by Bradley" did not prevent confusion between plaintiff's protected "Cross" pens and defendant's "LaCross by Bradley" pens); *Rodgers v. Wright*, 544 F.Supp.2d 302, 311 (S.D.N.Y.2008) (defendants' spin-off musical group "First Ladies of Chic" was confusingly similar to original "Chic"); *Am. Express Co. v. Am. Express Limousine Serv.*, 772 F.Supp. 729, 733 (E.D.N.Y. 1991) (finding the defendant's addition of "Limousine Services" to the plaintiff's "American Express" mark enhanced rather than dispelled confusion). Since Defendant's addition of the word "Club" to the NYC TRIATHLON Marks does little to dispel likely confusion, and in fact enhances the likelihood that consumers will assume an affiliation or sponsorship, this factor too weighs strongly in favor of a finding of likely confusion.

*3 & 4. Competitive Proximity/ "Bridging the Gap"*

■ The next two *Polaroid* factors to be considered are competitive proximity of the services offered under the NYC TRIATHLON Marks and by the NYC Triathlon Club and the intent of Plaintiff to "bridge the gap" between the two, to the extent they are not already offering the same services. The proximity inquiry looks both to the nature of the services and the structure of the relevant market and includes consideration of "the class of consumers to whom the goods are sold, the manner of advertising, the channels through which the goods are sold, and the extent to which the goods or services fall within the same class or are used together." *Clinique Labs.*, 945 F.Supp. at 553 (citations omitted). Thus, "the closer the secondary user's goods [or services] are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source." *Virgin Enters.*, 335 F.3d at 150 (citation omitted).

Here, Plaintiff and Defendant clearly operate in the same channels of trade. The individuals they service are exactly the same—those seeking to participate and train for an endurance sporting event. The sponsors are also the same sponsors of the race, sports drinks, bottled water, and equipment manufacturers, for example, are the very same sponsors that triathlon clubs seek for sponsorships. Indeed, Defendant has indicated on its website that it is actively engaged in seeking such sponsorships. V. Compl. ¶¶ 51, 54; Korff Decl. ¶ 56. Not only are the parties' services marketed to the same exact individuals and organizations, there is also no dispute that the services of a triathlon race

and a club which helps competitors prepare for triathlon races are "used together." Both parties also primarily receive "customers" online. V. Compl. ¶¶ 15, 48, 50; Korff Decl. ¶¶ 24, 25. Further, given the popularity of the NYC Triathlon and the ubiquity of triathlon clubs, there is a distinct likelihood that triathletes and sponsors will assume that Plaintiff has commissioned a triathlon club in its name. This is especially likely for a race occurring in the New York City area, where the New York City Marathon, another distinguished racing event held in the City, has been owned and operated by a running club, the New York Road Runners, for approximately forty years. Moreover, placing Plaintiff and Defendant in even closer proximity, Plaintiff has begun associating the NYC TRIATHLON Marks with a training club through its relationship with Reebok. *See* V. Compl. ¶ 29; Korff Decl. ¶ 36.[3]

■ "Bridging the gap" is closely related to the proximity of the products factor. This factor examines "whether the senior user of the mark is likely to enter the market in which the junior user is operating." *Tri–Star*, 14 F.Supp.2d at 356 (citation omitted). For this factor, courts examine "the likelihood that, even if the plaintiff's products were not so close to the defendants' when the defendant began to market them, there was already a likelihood that plaintiff would in the reasonably near future begin selling those products." *Virgin Enters.*, 335 F.3d at 150. Since Plaintiff and Defendant are already operating in the same channel of trade, this factor is already satisfied. According to Plaintiff, it has expressly considered creating a formal USAT-registered triath-

lon club whose name would bear the NYC TRIATHLON Marks and operate similarly to how New York Road Runners operates with regard to the NYC Marathon. Korff Decl. ¶ 38. Plaintiff states that its plan in this regard has been derailed due to Defendant's misappropriation and the likely consumer confusion that would stem from multiple triathlon clubs bearing the names "NYC Triathlon" or "NYC Tri."

These factors thus also strongly favor a finding of likely confusion.

### 5. Confusion Between Products and Services

The *Polaroid* test's fifth factor, evidence of actual confusion, also favors Plaintiff. "It is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Lois Sportswear, U.S.A. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir.1986); *see also Pfizer Inc. v. Sachs*, 652 F.Supp.2d 512, 523 (S.D.N.Y.2009) (same). This is particularly true when an infringing product or service has been on the market for only a short time. *See Pfizer*, 652 F.Supp.2d at 523 ("The absence of proof of actual confusion is not fatal to a finding of likelihood [of confusion], particularly where, as here, the junior mark has been in the marketplace for a relatively short period of time.") (quotation omitted); *Stern's Miracle–Gro Prods., Inc. v. Shark Prods., Inc.*, 823 F.Supp. 1077, 1087 (S.D.N.Y.1993) ("It would be unfair to penalize plaintiff for acting to protect [its] trademark rights before serious damage has occurred.") (quoting *Lois Sportswear*, 799 F.2d at 875).

---

**3.** Plaintiff also already operates the NYC Triathlon Club Championship ("NYC Tri Club Championship") as part of the NYC Triathlon (a fact of which Defendant is fully aware, as Defendant's affiliate, SBR, sponsored this event). This fact compounds the likelihood of confusion.

Despite the fact that Defendant's press release announcing the formation of the NYC Triathlon Club issued only on January 25, 2010, actual confusion as to whether Plaintiff owns and operates the club has already arisen. On or about December 23, 2009, Korff received an e-mail from the president of the Westchester Triathlon Club, who indicated that he "got an email about the NYC tri club [sic]. It looks great." V. Compl. ¶ 60; Korff Decl. ¶ ¶ 49, 50. Under the belief that Plaintiff owned and operated the NYC Triathlon Club, the sender requested that Korff add a particular triathlon to the NYC Triathlon Club's team schedule. V. Compl. ¶ 60; Korff Decl. ¶ 50. It is safe to assume that others have been confused by Defendant's use of the NYC TRIATHLON Marks and Plaintiff's trade name. It is also likely that this confusion will persist as Defendant continues to promote itself using the NYC Triathlon Club name. *See, e.g., Home Shopping Club, Inc. v. Charles of the Ritz Group, Inc.,* 820 F.Supp. 763, 774 (S.D.N.Y.1993) ("[T]he presence of past or present confusion supports, logically enough, a conclusion of future confusion, and has been recognized by the Second Circuit as an important factor in determining its likelihood."). As such, the "actual confusion" factor also favors a finding of likely confusion.

## 6. *Good Faith*

▮ The next factor, which considers whether Defendant was operating in good faith when selecting its name or mark, considers "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill, and any confusion between his and the senior user's product. The defendant's awareness of plaintiff's mark may give rise to an inference of bad faith, which is bolstered if the defendant offers no credible explanation for its adoption of the mark." *Arti-*

*san Mfg. Corp. v. All Granite & Marble Corp.,* 559 F.Supp.2d 442, 452 (S.D.N.Y. 2008) (citation omitted); *see also Pfizer,* 652 F.Supp.2d at 523 (noting that defendants were aware of plaintiff's marks and that defendants refused to comply with plaintiff's cease-and-desist letters).

Defendant's bad faith is apparent here. After operating for a number of years as SBR and SBR Triathlon Club, and serving as a sponsor of Plaintiff s event, Defendant decided that rather than pay a sponsorship fee to be affiliated with Plaintiff, it would simply change its name to Plaintiff's name. V. Compl. ¶ 45; Korff Decl. ¶ 49. As such, there is no question that Defendant was aware of Plaintiff's marks and it is evident that Defendant's clear intention was and is to capitalize on Plaintiffs reputation and goodwill by fostering confusion between his club and Plaintiff's triathlon services. This intent is made further evident by Defendant's failure to respond to Plaintiff's cease and desist letter. V. Compl. ¶ 55; Korff Decl. ¶ ¶ 51, 52. This appears to be a pattern for Defendant, as it has in bad faith attempted to trade on the goodwill of other famous sporting events in the past. Specifically, Defendant attempted to hold a race it referred to as the "Iron Race," trying to create some affiliation with the famous Ironman® triathlon mark. After receiving a cease and desist letter from the owner of the Ironman® mark, the race was cancelled. V. Compl. ¶ 52; Korff Decl. ¶ 53. This factor clearly weighs in favor of finding likely confusion. *See Kraft,* 831 F.Supp. at 132 ("When a company appropriates an identical mark that is well known and has acquired a secondary meaning, an inference can be drawn that the company intends to capitalize on the goodwill and reputation of the mark ...."); *Stern's Miracle–Gro,* 823 F.Supp. at 1087 (same).

### 7. Quality of Defendant's Products or Services

This *Polaroid* factor "is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Pfizer*, 652 F.Supp.2d at 523 (quotation omitted). Here, "the quality of the secondary user's product goes more to the harm that confusion can cause the plaintiff's mark and reputation than to the likelihood of confusion." *Virgin Enters.*, 335 F.3d at 152.

Plaintiff contends that Defendant has a pattern of sub-par business practices and poor customer support. For example, on at least one occasion, Defendant misused Plaintiff's brand by selling merchandise bearing the NYC TRIATHLON Marks without Plaintiff's approval. *See* V. Compl. ¶ 42; Korff Decl. ¶ 46. In another instance cited by plaintiff, during the 2009 NYC Triathlon, SBR (an Expo participant that year) advertised a raffle, whose proceeds went to charity, to be held in its physical store. Korff Decl. ¶ 47. SBR stated that the winner of the raffle would receive various triathlon gear, such as running shorts and a pair of shoes. *Id.* For months the winner attempted to collect his prize with no response from SBR. *Id.* After repeated futile attempts to collect, the winner of the raffle contacted Korff to inform him of SBR's poor customer service. *Id.* In an e-mail to Korff describing his mistreatment at the hands of SBR, the winner of the raffle stated, "The bottom line is that [SBR] treated me like dirt cause 1 wasn't in there to buy a $6000 bike. Then they ignored me for months when 1 was trying to follow up." *Id.; see also* Exhibit W to Korff Decl. As another example, Defendant's "Iron Race" was going to proceed with no safety precautions or staff in place. Korff Decl. ¶ 53. Defendant's apparent shoddy business practices and poor customer service would necessarily jeopardize Plaintiff's longstanding reputation.

### 8. Sophistication of Consumers

■ The *Polaroid* test's final factor analyzes the level of sophistication of consumers in the relevant market. However, even sophisticated consumers may be confused when two parties' marks and services are highly similar. *See The Morningside Group Ltd. v. Morningside Capital Group, LLC.*, 182 F.3d 133, 143 (2d Cir.1999).

In this case, the relevant market ranges from elite professionals to amateurs looking to compete in their first triathlon. Indeed, a majority of the registrants (56%) for the 2010 NYC Triathlon have identified themselves as first-time triathletes, Korff Decl. ¶ 11. It has been held that confusion is especially likely for "unsophisticated buyers." *See Guiness United Distillers & Vintners B.V. v. Anheuser–Bush, Inc.*, No. 02 Civ. 0861(LMM), 2002 WL 1543817, at *6 (S.D.N.Y. July 12, 2002). But here, even sophisticated triathletes are likely to be confused due to the similarity of the marks, as demonstrated by the e-mail Korff received from the president of the Westchester Triathlon Club. In his e-mail, the president, a sophisticated veteran of the triathlon community, indicated he has run the Westchester Triathlon Club for thirteen years and yet he was confused, assuming that Plaintiff had formed Defendant's club. *See* V. Compl. ¶ 60; Korff Decl. ¶ 50. This last *Polaroid* factor thus also favors likely confusion. *See GTFM*, 215 F.Supp.2d at 297.

The *Polaroid* factors weigh in favor of a finding of likely confusion. Thus, Plaintiff is likely to succeed on the merits of its

claim under § 43(a) of the Lanham Act.[4]

**Federal Dilution Claim**

The Trademark Dilution Revision Act of 2006 ("TDRA"), 15 U.S.C. § 1125(c) (2009), provides:

> the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

Thus, to prevail on a claim under the TDRA, a plaintiff must establish that: (1) the senior mark is famous; (2) the defendant is making use of the junior mark in commerce; (3) defendant's use of the junior mark began after the senior mark became famous; and (4) a likelihood of dilution. *Burberry Ltd. and Burberry USA v. Designers Imports, Inc.*, No. 07 Civ. 3997(PAC), 2010 WL 199906, at *7 (S.D.N.Y. Jan. 19, 2010). Plaintiff satisfies each of these elements.

*1. The NYC TRIATHLON Marks are Famous*

■ Under both the TDRA and its predecessor, the Federal Trademark Dilution Act of 1995, 15 U.S.C. § 1125(c)(1) (2000) (Section 43(c) of the Lanham Act), a plaintiff must demonstrate that its mark is famous. *Burberry Ltd. v. Euro Moda, Inc.*, No. 08 Civ. 5781(CM), 2009 WL 1675080, at *10 (S.D.N.Y. June 10, 2009).

The TDRA provides its own definition of what constitutes a famous mark: "a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). Furthermore, the statute sets forth a list of four non-exclusive factors for a court's consideration on the issue of fame: (i) the duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties; (ii) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (iii) the extent of actual recognition of the mark; and (iv) whether the mark was registered. 15 U.S.C. § 1125(c)(2)(A)(i)-(iv).

Although the registrations for Plaintiff's trademarks are still pending, Plaintiff's ten years of exclusive use, the extent of publicity associated with Plaintiff's marks, and their widespread recognition supports a finding of fame. The NYC Triathlon has been extensively promoted nationally and internationally since it began in 2001. Specifically, the NYC Triathlon has been publicized—via Plaintiffs own efforts, by sponsors, or via unsolicited coverage—by virtually every major national media outlet in the country during its ten years: ABC, NBC, CBS, FOX, CNN, The Wall Street Journal, The New York Times (in which it was the only triathlon in history to have been featured on the front page), USA Today, The New York Post, and by television and print coverage in nearly every U.S. state. V. Compl. ¶¶ 11, 14, 15, 16, 17; Korff Decl. ¶¶ 7, 16, 17, 20, 21, 22, 23. The NYC Triathlon itself has been tele-

---

4. Since the elements of Plaintiffs New York common law infringement claim mirror those of the Lanham Act, Plaintiff is also likely to prevail on its common law trademark infringement claim (Count IV). *See Burberry Ltd. and Burberry USA v. Designers Imports, Inc.*, No. 07 Civ. 3997(PAC), 2010 WL 199906, at *8 (S.D.N.Y. Jan. 19, 2010); *GTFM, Inc.* 215 F.Supp.2d at 300.

vised nationally and internationally by, *inter alia*, the FOX Network and the BBC, reaching over a billion people worldwide. V. Compl. ¶ 14; Korff Decl. ¶ 16. Korff estimates that 10% of the NYC Triathlon field each year is composed of international participants. Korff Decl. ¶ 11.

Plaintiff's sales success also supports a finding of fame. The event sells out in minutes, with 20,000 people around the world this year vying for the 5,600 entry spots. V. Compl. ¶ ¶ 7, 21; Korff Decl. ¶ 27. The event's entry spot revenue is 50% greater than the next biggest Olympic distance triathlon and ten times that of the average Olympic distance triathlon. V. Compl. ¶ 30; Korff Decl. ¶ 38. Plaintiff's sponsors too are wellknown famous brands, including Ford Motor Company, Nautica, Marriott Hotels, Gatorade, JetBlue, Visa, Dasani, Delta Airlines, and News Corp. V. Compl. ¶ ¶ 13, 16; Korff Decl. ¶ ¶ 15, 26. Approximately $2 million is raised each year for national charities, such as the American Cancer Society and the Leukemia & Lymphoma Society. V. Compl. ¶ 31; Korff Decl. ¶ 39. Approximately 250,000 people gather to watch the race, and Plaintiff has received thousands of emails praising the event as one of the best in the world. V. Compl. ¶ ¶ 21, 34; Korff Decl. ¶ ¶ 11, 41. It is clear that Plaintiff's marks are widely recognized.

### 2. Timing of Use of Mark

■ There is no dispute that Defendant is using the NYC Triathlon Club name in commerce. It has a website, accessible worldwide, at which it offers merchandise and club membership for $300 per year. V. Compl. ¶ 49; Korff Decl. ¶ ¶ 54, 55. Thus, the question is whether Defendant began using its name after Plaintiff's marks became famous. *See* 15 U.S.C. (c)(1). Defendant adopted its new name, effective January 1,2010. This is nearly

ten years after the first NYC Triathlon and well after the NYC TRIATHLON Marks acquired fame. V. Compl. ¶ ¶ 1, 10, 45; Korff Decl. ¶ ¶ 6, 15, 18, 52. As such, this factor weighs in favor of a finding of likely dilution.

### 3. Defendant's Actions

■ Under the TDRA, a trademark claimant need only demonstrate a likelihood of dilution by the junior mark. *See* 15 U.S.C. § 1125(c)(1); *Euro Moda*, 2009 WL 1675080, at *13. The statute further states that the likelihood of dilution may be established in two ways: by blurring or tarnishment of the mark. *See* 15 U.S.C. § 1125(c)(1); *Dan–Foam A/S v. Brand Named Beds, LLC*, 500 F.Supp.2d 296, 307 (S.D.N.Y.2007). Blurring is defined as an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark," 15 U.S.C. § 1125(c)(2)(B), and may be found "regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." 15 U.S.C. § 1125(c)(1). Blurring occurs "when there is a possibility that the mark will lose its ability to serve as a unique identifier of an owner's products, due to another party's use." *Nabisco*, 50 F.Supp.2d at 201. The statute provides six non-exclusive factors a court may consider when determining whether a mark was diluted by blurring: (i) the degree of similarity between the mark or trade name and the famous mark; (ii) the degree of inherent or acquired distinctiveness of the famous mark; (iii) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (iv) the degree of recognition of the famous mark; (v) whether the user of the mark or trade name intended to create an association with the famous mark; and (vi) any actual association between the mark or trade

name and the famous mark. 15 U.S.C. § 1125(c)(2)(B)(i)-(vi).

These factors have been discussed at length in connection with Plaintiff's § 43(a) claim. As established above, (i) Defendant's name differs only by the addition of the descriptive word "club" to Plaintiff's well-established marks, doing little to differentiate the two names; (ii) Plaintiff's Marks, having acquired secondary meaning, have a high degree of acquired distinctiveness; and (iii) Plaintiff's use of the NYC TRIATHLON Marks has been exclusive for ten years. Moreover, Plaintiff has guarded its exclusivity, requiring any sponsor of the NYC Triathlon to receive Plaintiff's written approval before using the NYC TRIATHLON Marks on any third-party materials, halting unauthorized uses of the NYC TRIATHLON Marks (with Defendant's SBR as an example) and sending cease and desist letters when necessary. *See* V. Compl. ¶¶ 28, 54; Korff Decl. ¶¶ 34, 51.

Likewise factors (v) and (vi) are established above. By changing its name from SBR Triathlon Club to NYC Triathlon Club, it is clear that Defendant intended to create an association with the well-known and highly respected NYC Triathlon. Korff Decl. ¶ 51. With respect to actual association, as stated above, a sophisticated member of the triathlon community associated Defendant's triathlon club with Plaintiff's operations. *See* Korff Decl. ¶¶ 49, 50. As Defendant only recently announced the NYC Triathlon Club's formation, it is reasonable to believe that other instances of this mistaken associa-

tion have occurred or will occur soon. Having established that each factor weighs in favor of finding a likelihood of dilution, Plaintiff is likely to succeed on the merits of its dilution claim by blurring.

■ The TDRA also provides recourse for a likelihood of dilution by tarnishment. This occurs when there is an "association arising from the similarity between a mark or a trade name and a famous mark that harms the reputation of the famous mark." 15 U.S.C. § 1125(c); *see also Euro Moda*, 2009 WL 1675080, at *13–14 (describing dilution by tarnishment and finding that defendants had tarnished plaintiffs marks). Courts have noted that the "*sine qua non* of tarnishment is a finding that plaintiff's mark will suffer negative association through defendant's use." *Euro Moda*, 2009 WL 1675080, at *13 (citation omitted). Given Defendant's reputation of trading on others' goodwill and providing poor customer service, *see* discussion *supra* Part II.A.6, there is a high likelihood that the NYC TRIATHLON Mark's will suffer a negative association through Defendant's use of them. *See also* Korff Decl. ¶¶ 57, 59. As such, it is likely that Plaintiff's will succeed on its claim of dilution by tarnishment as well.[5]

### Anticybersquatting Consumer Protection Act

■ The Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d) (Section 43(d) of the Lanham Act), was enacted to prevent cybersquatting, an expression that has come to mean

---

5. Plaintiff is also likely to succeed on its New York State law dilution claim (Count VI), N.Y.G.B.L § 360–I. New York law does not require a showing of fame, but rather, only requires demonstrating acquired distinctiveness of the mark. *See Kraft*, 831 F.Supp. at 133–34. As demonstrated above, Plaintiff's NYC TRIATHLON Marks have acquired sec- ondary meaning, particularly in New York, and Plaintiff's blurring and tarnishment analyses set forth above apply equally under New York law. *See Deere & Co. v. MTD Prods., Inc.,* 41 F.3d 39, 42–43 (2d Cir.1994) (affirming district court's entry of a preliminary injunction based on likelihood that defendant violated New York's anti-dilution statute).

the bad faith and abusive registration and use of the distinctive trademarks of others as internet domain names, with the intent to profit from the goodwill associated with those trademarks. *See Sporty's Farm, L.L.C. v. Sportsman's Mkt., Inc.*, 202 F.3d 489, 495 (2d Cir.2000). To successfully assert a claim under the ACPA, a plaintiff must demonstrate that; (1) its marks were distinctive at the time the domain name was registered; (2) the infringing domain names complained of are identical to or confusingly similar to plaintiff's mark; and (3) that the defendant has a bad faith intent to profit from that mark. *See* 15 U.S.C. § 1125(d)(1); *Sporty's*, 202 F.3d at 497–99; *BroadBridge Media, L.L.C. v. Hypercd.com*, 106 F.Supp.2d 505, 510 (S.D.N.Y.2000) (granting preliminary injunction); *see also Vogster Entm't, L.L.C. v. Mostovoy*, No. 09–CV–1036 (RRM)(RER), 2009 WL 691215, at *4 (E.D.N.Y. Mar. 16, 2009) (same).

As discussed above, the NYC TRIATHLON Marks, in use since 2001, were distinctive when Vandaele registered the www.nyctriclub.com domain name in March 2009 (*see* V. Compl. ¶¶ 47, 80) and Defendant's domain name is nearly identical and certainly confusingly similar to the NYC TRIATHLON Marks. *See Vogster*, 2009 WL 691215, at *4 (defendant held liable for cybersquatting plaintiff's "Vogster" mark by registering domain names "with the mere addition of the words "award," "awards," or "game" (e.g., "vogsterawards.com," etc.).").

The Court has also discussed above the third cybersquatting factor, Defendant's bad faith intent to profit from plaintiff's mark. *See* discussion *supra* Part II.A.5. Nonetheless, the ACPA provides its own set of nine non-exclusive factors for a court's consideration.[6] Those factors also favor a finding of bad faith on Defendant's part. For instance, Defendant has no intellectual property rights in the www.nyctriclub.com domain name, as it had not used the name in commerce prior to registration. Indeed, the NYC Triathlon Club was not formed until almost a year after the domain name was registered. *See Sporty's*, 202 F.3d at 498; V. Compl. ¶¶ 47, 56. Nor is it the legal name of anyone affiliated with Defendant. Defendant does not make fair use or noncommercial use of the mark at its site. To the contrary, Defendant's site makes commercial for-profit use of the mark at its site. V. Compl. ¶ 49; Korff Decl. ¶ 55. Finally, Defendant took Plaintiff's distinctive and famous name with intent to divert consumers from Plaintiff's site and harm Plaintiff's goodwill for its own commercial gain

---

**6.** The nine factors enumerated in the ACPA are: (1) the rights of the person, if any, in the domain name; (2) the extent to which the domain name consists of the legal name of the person; (3) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (4) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (5) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (6) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain; (7) the person's provision of material and misleading false contact information when applying for the registration of the domain name; (8) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names; and (9) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of section 43. 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX).

by creating confusion as to source and sponsorship. V. Compl. ¶ 60; Korff Decl. ¶ ¶ 50, 51. There is little other explanation for Defendant's change of name.

Accordingly, plaintiff has shown a likelihood of success on his cybersquatting claim.

### New York State Law Claims

"The essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Nabisco*, 50 F.Supp.2d at 212 (citations omitted). To assert an unfair competition under New York common law, a plaintiff must demonstrate: 1) a likelihood of confusion; and 2) the defendant's bad faith. *Kraft*, 831 F.Supp. at 135; *Stern's Miracle-Gro*, 823 F.Supp. at 1093 (same). Here, "likelihood of confusion is judged in an unfair competition claim in the same manner as a Lanham Act claim." *Nabisco*, 50 F.Supp.2d at 212 (citation omitted); *see also Tri-Star*, 14 F.Supp.2d at 363. Since the Court has found that Plaintiff has already demonstrated a likelihood of confusion between the parties' marks (*see* discussion *supra* Part II.A) and has also established that Defendant acted in bad faith, Plaintiff is also likely to succeed on its unfair competition claim.[7]

## II. *Irreparable Harm*

Plaintiff has invested substantial and unprecedented efforts into making the NYC Triathlon not only a financially successful venture, but one that is well-known, enjoyed by the participants and respected as a premiere international racing event. V. Compl. ¶ ¶ 18, 19, 30; Korff Decl. ¶ ¶ 25, 38. Plaintiff has amassed substantial goodwill and a very favorable reputation during its ten years of operation. V. Compl. ¶ ¶ 20, 34; Korff Decl. ¶ 28.

By misappropriating Plaintiff's trade name and the NYC TRIATHLON Marks, Defendant is not only trading on Plaintiff's earned goodwill, but also is taking from Plaintiff the ability to control its reputation and the services offered under its name and mark. This harm cannot be quantified and is irreparable. Every day that Defendant operates with Plaintiff's name, the ability of Plaintiff to signify its services and its reputation by its NYC TRIATHLON Marks is lessened.

It is well-settled that a trademark owner's loss of goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard. *See Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 43 (2d Cir.1986); *Saban Entm't, Inc. v. 222 World Corp.*, 865 F.Supp. 1047, 1056 (S.D.N.Y.1994); *Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F.Supp. 123, 136 (S.D.N.Y.1993). It has also been held repeatedly in the Second Circuit that where there is likely confusion in an action for trademark in-

---

**7.** Similarly, Plaintiff is likely to succeed on its claim for violation of N.Y.G.B.L. § 349, New York's deceptive business acts law. This statute proscribes "[d]eceptive acts and practices in the conduct of any business, trade or commerce or in the furnishing of any service" in New York. N.Y.G.B.L. § 349 (2009). A party challenging an act or practice under this statute must show that: (1) defendant engaged in a consumer-oriented act, (2) that the consumer-oriented act was misleading in a material way, and (3) that plaintiff consequently suffered injury. *GTFM*, 215 F.Supp.2d at 301–02 (granting preliminary injunction where defendant violated § 349 when it intentionally used a designation "in a manner confusingly similar to [plaintiff's] use of [its own] trademark, and causing actual confusion."). Defendant's misbranding of itself, suggesting an affiliation with Plaintiff when no such affiliation exists, is misleading to New York consumers. It also harms Plaintiff.

fringement, the requisite irreparable harm is established as a matter of course. *See Zino Davidoff SA*, 571 F.3d at 246–47; *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir.2005); *Guccia Am., Inc. v. Curveal Fashion*, No. 09 Civ. 8458(RJS), 2010 WL 308303, at *2 (S.D.N.Y. Jan. 20, 2010); *E. Gluck Corp. v. Rothenhaus*, 585 F.Supp.2d 505, 519 (S.D.N.Y.2008).

A presumption of irreparable harm also flows from a finding of likely dilution. *See Ryan v. Volpone Stamp Co.*, 107 F.Supp.2d 369, 404 (S.D.N.Y.2000); *NBA Props. v. Untertainment Records LLC*, No. 99 Civ. 2933(HB), 1999 WL 335147, at *6 (S.D.N.Y. May 26, 1999); *Nabisco, Inc. v. PF Brands, Inc.*, 50 F.Supp.2d 188, 197 (S.D.N.Y.1999).

Due to the likelihood of Plaintiffs success on both its 43(a) and its dilution claims, Plaintiff is entitled to a presumption of irreparable harm

### III. *Balance of the Hardships*

■ The issue of relative hardship here tips decidedly toward Plaintiff. If left unremedied, the immediate and irreparable harm to Plaintiff resulting from Defendant's unlawful acts would far exceed any theoretical harm to Defendant from an improvidently granted injunction. Plaintiff lost goodwill and the control of its reputation at the moment Defendant launched its infringing triathlon club name, and Plaintiff continues to face this loss until Defendant's acts are enjoined. No monetary sum can sufficiently remedy Plaintiff for this type of harm to its name and brand. In addition, Plaintiff, which has been the sole operator of the NYC Triathlon since 2001, has already spent ten years, and continues to spend significant time and resources, developing and establishing its brand. V. Compl. ¶¶ 1, 17, 18, 19, 25, 26, 33; Korff Decl. ¶¶ 12, 23, 24, 25, 28, 32, 40, 41.

Defendant, by contrast, has only *just* adopted the "NYC Triathlon Club" name, inexplicably changing its name from SBR Triathlon Club, as of January 2010. V. Compl. ¶ 45; Korff Decl. ¶ 52. There seems to be no reason why Defendant could not just as easily select another new non-infringing name for its club. Korff Decl. ¶¶ 57, 58. Enjoining Defendant from using Plaintiff's Mark will not precluded Defendant from selling its products or services. Defendant has been using the disputed mark for only a short time and thus has developed little or no goodwill in the mark. The irreparable harm to the Plaintiff clearly outweighs any harm caused to the Defendant by virtue of the entry of a preliminary injunction requiring a defendant to change its name and mark.

In *Stern's Miracle–Gro Products, Inc. v. Shark Products, Inc.*, the court concluded that the balance of hardships decidedly favored the plaintiff after taking into account the facts that the defendant had only been using the mark in dispute ("Miracle–Gro"), for 18 months and that the defendant had another name available for its products. 823 F.Supp. at 1093–94. The court noted that, on the other hand, the plaintiff had spent approximately $ 100 million establishing the goodwill of the mark and had focused its efforts on successfully establishing secondary meaning. *Id.* at 1094. The defendant was enjoined from further use of the "Miracle Gro" mark. *Id.* at 1095. *See Les Ballets Trockadero De Monte Carlo, Inc. v. Trevino*, 945 F.Supp. 563, 574 (S.D.N.Y.1996).

The hardships here weigh in favor of Plaintiff due to its exclusive, long-term and well-known use of the NYC TRIATHLON Marks. Any harm to Defendant, who has not used the name "NYC Triathlon Club" for very long, who therefore has little or

no goodwill established, and who has other names and marks available to it, would not outweigh the irreparable harm and damage to Plaintiff should Defendant continue its infringing and confusing use of Plaintiff's name and Marks.

Accordingly, Plaintiffs motion for an order preliminarily enjoining Defendant's ongoing trademark and trade name infringement, dilution, cybersquatting, unfair competition, and deceptive trade practices is granted.

This constitutes the decision and order of the Court.

## DECISION AND ORDER GRANTING PLAINTIFF'S MOTION TO ENFORCE THE PRELIMINARY INJUNCTION AND DENYING DEFENDANT'S MOTION TO VACATE THE PRELIMINARY INJUNCTION

### OVERVIEW

On February 22, 2010, the New York City Triathlon, LLC ("Plaintiff") filed a motion for an order to show cause seeking a preliminary injunction, pursuant to Federal Rule of Civil Procedure 65, to prevent and restrain New York City Triathlon Club (also "NYC Triathlon Club" or "Defendant") from using "NYC Triathlon Club," "NYC Tri Club," and "New York City Triathlon Club" ("Defendant's Marks" or the "Club Marks") as names, trade names or trademarks, or as a domain name on the Internet, or in any other way that is likely to cause confusion with Plaintiff or its trade name and trademarks, NEW YORK CITY TRIATHLON, NYC TRIATHLON, and NYC TRI ("Plaintiff's Marks" or the "NYC TRIATHLON Marks").

Defendant (a corporation) failed to appear by counsel and therefore defaulted on the motion. As a result, on March 9, 2010, the Court issued a written decision preliminarily enjoining Defendant from ongoing trademark and trade name infringement, including the use of any name or mark confusingly similar to Plaintiff's Marks. *See New York City Triathlon, LLC v. NYC Triathlon Club, Inc.,* No. 10 Civ. 1464, 2010 WL 808885 (S.D.N.Y. Mar. 9, 2010) ("March 9, 2010 Decision and Order"); *see also* Order to Show Cause, Mar. 18, 2010. Familiarity with the Court's decision is presumed.

One and a half weeks later, on March 18, 2010, Plaintiff filed a motion to enforce the preliminary injunction, alleging, among other things, that Defendant's "new" name for its company—"Triathlon Club NYC"— merely rearranges the club's old name, and so continues to infringe on Plaintiff's Marks because it is confusingly similar to one or more of Plaintiff's Marks. Plaintiff also alleges that Defendant has wantonly disregarded this Court's order, by failing to discontinue use of infringing marks on various social networking sites, including Twitter. Finally, Plaintiff alleges that Defendant most recently violated the Court's injunction by promoting its club at the Multisport World Conference and Expo under the name "New York City Triathlon Club"—the name this Court enjoined it from using on March 9, 2010. (Decl. of V. Brumfield, Apr. 19, 2010 ("Brumfield Decl.") ¶¶ 3–4.)

Defendant, now appearing by counsel, opposes Plaintiff's motion and cross-moves to vacate the preliminary injunction. For the reasons set forth below, Plaintiff's motion to enforce the injunction is granted, and Defendant's motion to vacate is denied.

### DISCUSSION

██ A district court has complete power over its interlocutory orders, including preliminary injunctions, permitting it to

afford relief as necessary. Fed.R.Civ.P. 60(b); *Ideal Toy Corp. v. Sayco Doll Corp.*, 302 F.2d 623, 625 (2d Cir.1962). Additionally, this Court has plenary power over a preliminary injunction and has the equitable discretion to vacate or revise it. *Update Art, Inc. v. Charnin*, 110 F.R.D. 26, 35–36 (S.D.N.Y.1986).

## I. Preliminary Injunctive Relief

In the Second Circuit, a party seeking a preliminary injunction has historically been required to demonstrate that it will suffer irreparable harm absent injunctive relief, and either (1) that it is likely to succeed on the merits of the action; or (2) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, provided that the balance of hardships tips decidedly in favor of the moving party. *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir.2010) (internal quotations and citation omitted); *accord Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 152–53 (2d Cir.2007) (applying the standard to Lanham Act claims).

■■■ However, the Circuit has recently revisited the standard for injunctive relief in the context of an action for copyright infringement. It concluded that its "long-standing standard ... is inconsistent with the 'test historically employed by courts of equity' and has, therefore, been abrogated by *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)." *See Salinger v. Colting*, 607 F.3d 68, 74–75 (2d Cir.2010). In *Salinger*, the court held that a preliminary injunction should issue upon a showing of a plaintiff's likelihood of success on the merits only where the plaintiff has also shown that: (1) "he is likely to suffer irreparable injury in the absence of an injunction"; (2) "remedies at law, such as monetary dam-

ages, are inadequate to compensate for that injury"; (3) the balance of hardships tips in his favor; and (4) "the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Id.* at 80 ("*citing eBay*, 547 U.S. at 391, 126 S.Ct. 1837)." Although the *Salinger* court made clear that its holding was "limited to preliminary injunctions in the context of copyright cases," the court also explained that it saw "no reason that *eBay* would not apply with equal force to an injunction in any type of case." *Salinger*, 607 F.3d at 78 n. 7 (emphasis in original).

The Court understands *Salinger* as indicating that the standard for injunctive relief historically applied in this jurisdiction must be abandoned in favor of the one articulated by the Supreme Court (whose mandates we are all bound to follow) in *eBay*. The Court can think of no reason why the standards for injunctive relief articulated by the High Court in a copyright infringement case might not apply in a trademark infringement case. Accordingly, this Court analyzes New York City Triathlon LLC's claims by applying the five-fold test of *eBay* and *Salinger*.

## II. Likelihood of Success on the Merits

A trademark is defined in 15 U.S.C. § 1127 as including "any word, name, symbol, or device, or any combination thereof used by any person "to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." In order to be registered, a mark must be capable of distinguishing the applicant's goods from those of others. 15 U.S.C. § 1052.

■■■ Following the classic formulation set out by Judge Friendly, marks may be classified into one of five categories by order of increasing distinctiveness: (1) ge-

neric; (2) descriptive; (3) suggestive; (4) arbitrary; or (5) fanciful. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976). "The latter three categories of marks, because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). By contrast, generic marks—those that refer "to the genus of which the particular product is a species"—can never be registered as trademarks. *Abercrombie & Fitch*, 537 F.2d at 9.

 A mark that is merely descriptive of a product is not inherently distinctive and therefore merits protection only once it has acquired "secondary meaning." *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194–95, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985); *Two Pesos, Inc.*, 505 U.S. at 769. A mark obtains secondary meaning in one of two ways: "it may be proved as a matter of fact that the mark connotes a single source of origin to the public consumer or secondary meaning may be established through registration of a trademark." *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir.1993).

 To prevail in a trademark infringement action under the Lanham Act, a plaintiff must prove both that its mark is protectable and that there is "a probability [likelihood] of confusion" affecting "numerous ordinary prudent purchasers." *Id.* at 1077. "Likelihood of confusion includes confusion of any kind, including confusion as to source, sponsorship, affiliation, connection, or identification." *Guiness United Distillers & Vintners B.V. v. Anheuser–Bush, Inc.*, 64 U.S.P.Q.2d 1039, 1041 (S.D.N.Y.2002) (*citing McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. 1268, 1273 (S.D.N.Y.1986)). "In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market. The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 204–05 (2d Cir.1979) (internal citations omitted).

In this case, Defendant argues that the Court's original findings should be vacated for three reasons. First, Defendant asserts that Plaintiff's Marks are generic—not descriptive—and, therefore, are not entitled to trademark protection. (Def.'s Br. at 9–12.) Second, Defendant opines that to the extent Plaintiff's Marks could be considered descriptive, they are not protectable because they have not acquired secondary meaning. (*Id.* at 12–14.) Third, Defendant argues in the alternative that there is no likelihood of confusion between Plaintiff's and Defendant's Marks and therefore Defendant's Marks are non-infringing. (*Id.* at 15–21.)

Each of these arguments is without merit.

## A. Plaintiffs Marks are Protectable

 Plaintiff's Marks are descriptive, not generic, as Defendant contents. It is well-settled that geographic terms, even when coupled with a generic term (e.g., "New York City" plus "triathlon"), are considered descriptive rather than generic. *See New York Stock Exchange, Inc. v. New York, New York Hotel, LLC*, 293 F.3d 550, 557 (2d Cir.2002) (holding "New York," plus generic term "stock exchange" was descriptive). The United States Patent and Trademark Office (the "PTO") recognizes this basic principle, having permitted the registration of both "LOS ANGELES TRIATHLON" and "CHICAGO TRIATHLON" (*see* Decl. of

J. Caress, Mar. 25, 2010 ("Caress Decl."), ¶ 5; Decl. of J. Caille, Mar. 25, 2010 ("Caille Decl."), ¶ 5), neither of which would be protectable, and therefore registerable as marks, if they were merely generic, *see Abercrombie & Fitch*, 537 F.2d at 9.

Plaintiff's Marks have also acquired secondary meaning, contrary to Defendant's argument.

In determining whether descriptive marks, like Plaintiff's, have acquired secondary meaning (and are therefore protectable), the Second Circuit has set forth a number of relevant considerations that must be analyzed: (1) advertising expenditures; (2) sales success; (3) unsolicited media coverage of the product; (4) attempts to plagiarize the mark; (5) the length and exclusivity of the mark's use; and (6) consumer studies linking the name to a source. *See Thompson Med. Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir. 1985); *see also New York City Triathlon*, 2010 WL 808885, at *3.

As this Court explained in its March 9, 2010 Decision and Order, there is more than enough evidence in the record for the Court to conclude that Plaintiff's marks have acquired secondary meaning. This year, the New York City Triathlon will celebrate its tenth anniversary as the only Olympic distance triathlon to take place in the rivers, streets and parks of New York City. (Decl. of J. Korff, Feb. 22, 2010 ("Korff Decl.") ¶ 27.) Until this year, when Defendant changed its name from the SBR Triathlon Club to the New York City Triathlon Club, Plaintiff had been the exclusive user of the NYC TRIATHLON Marks during the triathlon's ten years of existence. (*Id.* ¶ 42.) Plaintiff has also been extremely protective of the exclusivity and use of its marks, requiring all sponsors to seek its written approval before using them on any goods, services or literature they publish or distribute. (*Id.*

¶ 34.) Plaintiff has policed unauthorized use of its marks (*see id.*), and has filed trademark applications for its NYC TRIATHLON Marks with the PTO (*id.* ¶ 43), which are currently pending.

Plaintiff's race has received tremendous solicited and unsolicited media coverage, including television coverage on CNN, NBC, CBS, ABC, FOX, SNY, the BBC, YES Network, Fox Sports Network, the Outdoor Life Network, and the Weather Channel; and newspaper coverage in the *New York Times, New York Post, Wall Street Journal, USA Today,* and the Associated Press. (Pl.'s Br. at 7–8; Korff Decl. ¶¶ 16, 17, 20–23 & Exs. B–Q.) Plaintiff's principal, John Korff, has been interviewed repeatedly and quoted extensively in the press about the race. (Pl.'s Br. at 6 (*citing* Korff Decl. Ex. Q; Supplemental Decl. of J. Korff, Mar. 26, 2001, Ex. B).) Plaintiff has engaged in a large-scale advertising campaign, placing ads in the *Wall Street Journal, New York Post, Metro Sports NY,* and "every major triathlon magazine." (Korff Decl. ¶ 23.) Plaintiff has also advertised on CBS, FOX and radio stations, including Z–100 and W–FAN. (*Id.* & Ex. R.)

Plaintiff's event is clearly a commercial success, having sold out all 5600 entry spots in 6 minutes 43 seconds, after they went on sale at 12:01 a.m. on November 1, 2009. (Korff Decl. ¶ 27.) The event grosses approximately $2.3 million annually, which reflects its widespread appeal and name recognition—it has been viewed by over 60 million people in the United States and over a billion worldwide. (Korff Decl. ¶¶ 16, 38.) Defendant's plagiarism of Plaintiff's name only highlights the value of the "New York City Triathlon" brand, since intentional copying is persuasive evidence of secondary meaning. *LeSportsac, Inc. v. K mart Corp.*, 754 F.2d 71, 78 (2d Cir.1985). And Plaintiff's pano-

ply of corporate sponsors, which at various times has included Dasani water, Delta Airlines, Visa, JetBlue, Janus Capital Group, Toyota, News Corp., Nautica and Ford, does nothing to undermine Plaintiff's assertion that the New York City Triathlon is among the premier triathlons worldwide, with widespread name recognition. (*Id.* ¶¶ 15, 26.)

██ Defendant argues that this abundant evidence is insufficient to support a finding of secondary meaning for two reasons: (1) Plaintiff's use of its marks has not been exclusive, because it has co-existed with an organization using the name "New York Triathlon Club," and (2) Plaintiff cannot be identified as the sole sponsor of the race because Plaintiff has allowed other corporate sponsors to affiliate with the event by affixing their house marks to the race name on promotional materials (e.g., NAUTICA New York City Triathlon, FORD New York City Triathlon). (Def.'s Br. at 13–14.) The Court finds neither argument persuasive.

All that is necessary to establish a secondary meaning is that the ordinary buyer associates the mark with a single source, even if that source is anonymous. *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.,* 830 F.2d 1217, 1221 (2d Cir.1987). Thus, the fact that the public is probably unaware of the existence of the limited liability corporation registered as New York City Triathlon LLC does not negate the Court's prior finding of secondary meaning.

██ Moreover, that a product (in this case, the race known as the New York City Triathlon) has been known at times by similar but not identical names (namely, the "FORD New York City Triathlon," the "FORD New York City Triathlon presented by accenture," the "NAUTICA New York City Triathlon presented by Toyota," the "NAUTICA New York City Triathlon

presented by RCN" (Korff Decl. Exs. B–F)) does not dilute the inference of its origin, especially where, as here, the race appears to be most often referred to simply as the "New York City Triathlon" (*see* Korff Decl. Exs. O–P (cataloging news coverage of the event)). *Cf. Essie Cosmetics, Ltd. v. Dae Do Int'l, Ltd.,* 808 F.Supp. 952, 959 (E.D.N.Y.1992) (private label sales did not negate secondary meaning in trade dress infringement action where product appeared largely under a single label): *I.P. Lund Trading ApS v. Kohler Co.,* 11 F.Supp.2d 112, 121 (D.Mass.1998) (private label sales did not negate secondary meaning). Plaintiff has used and promoted its marks exclusively for the past decade. Its considerable evidence—not just of the expenditure of substantial sums, but of press and public recognition of its race as the "New York City Triathlon" and Korff's association therewith—demonstrates that its efforts and expenditures have promoted the marks as identifiers of its product (the race). (*See, e.g.,* Korff Decl. Exs. O–P.)

Likewise, the fact that Plaintiff has co-existed with an entity known as New York Triathlon Club does not, in and of itself, obviate its acquisition of secondary meaning for its marks. 'The owner of a mark is not required to police every conceivably related use thereby needlessly reducing non-competing commercial activity and encouraging litigation in order to protect a definable area of primary importance.' *24 Hour Fitness USA. Inc. v. 24/7 Tribeca Fitness, LLC,* 447 F.Supp.2d 266, 272 (S.D.N.Y.2006) (*quoting Playboy Enters., Inc. v. Chuckleberry Publ'g, Inc.,* 486 F.Supp. 414, 422–23 (S.D.N.Y.1980)). Thus, in *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.,* a court found that plaintiff Playboy magazine was entitled to litigate against "Playmen" magazine even though the company had failed to litigate against "Players" or "Playguy,"

two other magazines with related names. *Id.* at 422–23.

In this case, New York City Triathlon LLC has not commenced any litigation against an entity called the New York Triathlon Club ("NYTC"), a triathlon race organizing corporation founded in 1984 and based approximately 100 miles north of New York City, in Saugerties, New York. (*See* Decl. of D. Honig, Mar. 25, 2010 ("Honig Deck") ¶ 1; Pl.'s Br. at 7.) Plaintiff explains that it is not concerned about confusion between its organization and NYTC because NYTC does not compete with New York City Triathlon LLC. Aside from one NYTC race that takes place in New York City's Central Park, NYTC operates in a fundamentally different market (upstate New York as opposed to New York City). (Pl.'s Br. at 7; Honig Decl. ¶ 2.) Second, New York Triathlon Club's races are not "extensively promoted or advertised," as Plaintiffs race is. (*Id.*) Third, the names of the organizations have significantly different meanings (i.e., New York Triathlon Club versus New York *City* Triathlon LLC), because most, if not all, consumers interpret the name "New York Triathlon Club" to be New York *State* Triathlon Club. (*Id.*)

The Court questions whether consumers will always or predominantly infer that an organization using the prefix "New York" (absent "City") necessarily refers to a statewide group. New York City is, after all, often referred to as "New York," as evidenced, for example, by any of the dozens of pop songs entitled "New York, New York" that are about New York City.

However, in this case, NYTC's mark is a "word-design" mark (a mark coupled with an image or picture), and as such, the club's name appears in an arc above a large yellow graphic of New York State, which forms the core of the mark. (*See* Decl. of C. Vandaele, Mar. 23, 2010 ("Van-daele Decl."), Ex. 9 (screen shot of NYTC website).) Given the fact that the state logo is the central component of the NYTC mark, the Court agrees with Plaintiff that NYTC and New York City Triathlon LLC are readily distinguishable entities; they have distinctive marks with features plainly indicating that the two groups operate almost (at least primarily) in different markets, and so are not likely to be confused.

Additionally, while third party use of similar marks can sometimes "dilute the strength of a mark," the mere existence of a single related mark is insufficient to negate a finding of secondary meaning, absent evidence that the similar mark (in this case, NYTC's mark) is well-promoted or recognized by consumers. *See Nabisco v. Warner–Lambert Co.*, 32 F.Supp.2d 690, 698–99 (S.D.N.Y.1999); *Trs. of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733, 744–45 (S.D.N.Y.1997); *see also Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F.Supp.2d 271, 281–82 (S.D.N.Y.1998) (fact that 125 businesses incorporated the word "Lexington" was of little probative value absent evidence that the other marks were "well-promoted or recognized by consumers"). Since no one contends that NYTC's mark is well-promoted or easily recognized by consumers, and no evidence has been presented to this Court indicating that NYTC advertises or promotes of its mark extensively, the Court does not find that the existence of the Saugerties-based New York Triathlon Club dilutes Plaintiff's Marks or in any way undermines the Court's previous finding that Plaintiff's Marks have obtained secondary meaning.

**B. Likelihood of Confusion**

Since Plaintiff's Marks are protectable, the question is only whether there is a likelihood of confusion between the NYC

TRIATHLON Marks and Defendant's Club Marks. The Second Circuit has articulated eight factors, known as the *"Polaroid"* factors, to be considered when assessing the likelihood of consumer confusion:

(1) the strength of the plaintiff's mark;

(2) the similarity of the plaintiff's and defendant's marks;

(3) the competitive proximity of the products or services;

(4) the likelihood that the plaintiff will "bridge the gap" and offer a product or service similar to the defendant's;

(5) actual confusion between the products or services;

(6) good faith on the defendant's part;

(7) the quality of the defendant's products or services; and

(8) the sophistication of buyers.

*Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961). In weighing these factors, the Circuit has counseled that "no single *Polaroid* factor is determinative." *Plus Prods. v. Plus Discount Foods, Inc.,* 722 F.2d 999, 1004 (2d Cir.1983).

**(1) & (2) Strength and Similarity of Marks**

As discussed above, a mark's strength may be measured in two very different ways: (1) inherent strength, resulting from the mark's degree of inherent distinctiveness, usually measured on the ladder ranging from unprotectable generic marks to arbitrary, fanciful marks that enjoy the broadest protection, *see Abercrombie & Fitch,* 537 F.2d at 9–11; and (2) acquired strength, reflecting the degree of consumer recognition the mark has achieved. Because the policies of trademark law have historically disfavored a grant of exclusive rights to marks that are descriptive, *see id.*

at 10, the Lanham Act's compromise allowed descriptive marks registration and a minimal scope of protection, which is contingent on establishing that the mark had acquired a secondary meaning as a designator of source. *TCPIP Holding Co. v. Haar Commc'ns, Inc.,* 244 F.3d 88, 100 (2d Cir.2001).

Defendant argues that, because Plaintiffs mark is descriptive—even though it has acquired secondary meaning—it is entitled only to a negligible amount of protection and therefore Defendant should be allowed to call itself "New York City Triathlon Club" for any one of three reasons. (Def.'s Br. at 15–16.)

First, Defendant argues that its use of graphics (an orange stylized headshot of the Statue of Liberty superimposed on a blue background shaped like the New York Cityscape onto which the words "New York City Triathlon Club" are grafted) wholly distinguishes the two sets of marks, since Plaintiff's is only a word mark. (Def.'s Br. at 15–16.) The Court disagrees. While conflicting marks are to be compared by looking at them as a whole, rather than breaking the marks into their component parts for comparison, *Estate of P.D. Beckwith, Inc. v. Comm'r of Patents,* 252 U.S. 538, 545–46, 40 S.Ct. 414, 64 L.Ed. 705 (1920), it is appropriate in determining the question of likelihood of confusion to give greater weight to the important or "dominant" parts of a composite mark, *Kangol Ltd. v. Kangaroos U.S.A., Inc.,* 974 F.2d 161, 163 (Fed.Cir. 1992). Where a mark contains both a design and a word, the word is generally considered to be dominant and is therefore accorded greater weight. *Herbko Int'l. Inc. v. Kappa Books, Inc.,* 308 F.3d 1156, 1165 (Fed.Cir.2002): *In re 1st USA Realty Prof'ls, Inc.,* 84 U.S.P.Q.2d 1581, 1586 (T.T.A.B.2007). This is especially true where the design or image "merely aug-

ments the message conveyed by the word." *Worthington Foods, Inc. v. Kellogg Co.,* 732 F.Supp. 1417, 1440 (S.D.Ohio 1990) (word considered dominant in a composite mark consisting of a heart-shaped design and the word, "HEARTWISE"); *accord In re Strathmore Prods., Inc.,* 171 U.S.P.Q. 766, 767–68 (T.T.A.B.1971) (GLISTEN and tear drop design was confusingly similar to GLISS'N word mark because of phonetic and meaning identity between the two words). In assessing which features of a mark are dominant, while words and their pictorial representations should not be "equated as a matter of law," a fact finder may equate them as a "factual matter." *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 257 (2d Cir.1987) (noting that the district court equated the word mark PEGASUS with Mobil Oil's "flying horse" design mark).

In this case, the word components of the two sets of marks are plainly dominant, and Defendant's graphics are insufficient to distinguish them. The Statue of Liberty is well-known synecdoche for New York City, and the cityscape is nothing but a geographical referent; therefore, Defendant's use of these images does no more than emphasize the geographical affiliation of the mark. In light of this fact—that "New York City Triathlon" is the salient feature in both marks—the Court cannot say that Defendant's mark is not confusingly similar to Plaintiff's mark, even though the marks do appear to the eye to be different. Defendant's use of graphics is insufficient to give consumers a distinct overall impression; the mental impact of the two marks outweighs any visual difference between them. *See Am. Home Prods. Corp. v. Johnson Chemical Co.,* 589 F.2d 103, 107 (2d Cir.1978).

 Second, Defendant argues that Plaintiff's frequent use of logos or house marks alongside its NYC TRIATHLON Marks makes it unlikely that there will be any confusion between Plaintiff's and Defendant's marks. That is, Plaintiff's word mark often appears in between two corporate sponsors' marks: Nautica's in thin blue lettering, above bold, bright yellow-gold text that reads, "New York City Triathlon," which is followed by very small blue text that states: "presented by RCN" (where RCN is represented by a house mark, the letters RCN followed by a star). Defendant proffers that use of these marks, a customary practice in the industry, renders Plaintiff's Mark completely different from the Club Marks.

While the Second Circuit has sometimes held that "the presence of a distinct brand name may weigh against a finding of confusing similarity," the Circuit has often found that the "addition of a trade name does not necessarily alleviate the problem of confusion of marks, and indeed, can aggravate it, as a purchaser could well think plaintiff had licensed defendant as a second user." *Playtex Prods., Inc. v. Georgia–Pacific Corp.,* 390 F.3d 158, 165 (2d Cir.2004) (citing cases, internal quotations omitted). For example, in *A.T. Cross Co. v. Jonathan Bradley Pens, Inc.,* 470 F.2d 689, 692 (2d Cir.1972), the Second Circuit explained that the addition of the junior user's trade name, "by Bradley," would not dispel confusion between "La Crosse" (or "LaCrosse") and plaintiff's "Cross" mark, where both companies marketed and sold pens.

In this case, the corporate logos are not the dominant component of Plaintiff's Marks and therefore do not help to distinguish the Club Marks from Plaintiff's. "New York City Triathlon" appears in bold yellow-gold lettering, while the house marks frame the central event in subtle blue text around its edges. Likewise, the absence of a corporate logo on the Club Marks does nothing to dispel any potential

confusion between the two sets of marks, because, just as in *A.T. Cross,* it is likely that consumers will infer that the marks are related—Plaintiff and Defendant are in the same business, have marks that sound nearly identical, that use similar color schemes (blue-orange and blue-gold), and the dominant portions of the two sets of marks overlap.

Moreover, the house marks associated with Plaintiff's race are not really relevant to the inquiry before the Court, since the basis of the complaint in this case is limited to the use of the NYC TRIATHLON word Marks. As with challenges to trademark registration before the PTO, the use of a house mark in conjunction with a product mark does not serve to prevent a finding of likelihood of confusion when the house mark is not included in the mark for which registration is sought (or in this case, the marks on which the demand for injunctive relief is based). *See In re Microsoft Corp.,* 68 U.S.P.Q.2d 1195, 1199 (T.T.A.B.2003). In *Microsoft,* the relevant inquiry was therefore limited to whether Microsoft's applied-for mark "OFFICE.NET" was confusingly similar to the previously registered mark "OFFICENET", even though Microsoft represented that it intended to use its house mark ("MICROSOFT") in connection with any use of iOFFICE.NET. *Id.*

*Microsoft* is instructive here. Plaintiff has applied for registration of NEW YORK CITY TRIATHLON, NYC TRIATHLON, and NYC TRI. None of these marks bears the trade name of the race's corporate sponsors, even though Plaintiff sometimes refers to its race using the house mark of its corporate sponsor (e.g., NAUTICA or FORD). Because the applied-for marks—and indeed, the marks in the complaint at issue in this case-do-not incorporate a house mark, the relevant inquiry is limited to whether Defendant's

use of its Club Marks is confusingly similar to one or more of Plaintiff's applied-for marks (the NYC TRIATHLON Marks), without reference to any concomitant corporate logo. And for the reasons already stated, the Court finds that "New York City Triathlon" and "New York City Triathlon Club" are confusingly similar.

Third, Defendant argues that the "slight difference" of adding the suffix "Club" to "New York City Triathlon" is sufficient to dispel confusion between Plaintiff's and Defendant's marks. But "Club" is a generic term, and generic terms are given less weight in analyzing the likelihood of confusion between marks "on the rationale that the public will look to other portions of the marks and will not be confused unless the other portions are similar." 2 *McCarthy on Trademarks and Unfair Competition* 23:15(F) (supp.1990 at 44). This Court recognizes that, more often than not, analysis of the use of generic terms in this context has been limited to cases where two marks share a generic term, *see, e.g., Am. Cyanamid Corp. v. Connaught Labs., Inc.,* 800 F.2d 306 (2d Cir.1986) (HIB–IMUNE and HibVax, where "hib" was the generic term), whereas the facts of this case involve only a junior user's appropriation of a generic term. However, this distinction does not undermine the basic logic that courts ought to disregard generic components of marks because the public can be said to rely more on the non-generic portion of a given mark. *See In re Nat'l Data Corp.,* 753 F.2d 1056, 1058–60 (Fed.Cir.1985). Indeed, in a case that similar to the one at bar, Judge Brody of the Eastern District of Pennsylvania applied precisely this principle, holding that the mere addition of the word "club" to Villanova University's mark "Wildcats" was insufficient to distinguish the defendant ("Wildcat Club") from the university and its sponsored entities. *Villanova Univ. v. Villanova Alumni Educ.*

*Found., Inc.,* 123 F.Supp.2d 293, 305 (E.D.Pa.2000).

Accordingly, I conclude that the first two factors of the *Polaroid* test favor Plaintiff and do not support vacating the injunction. Although Plaintiff's NYC TRIATHLON Marks are entitled to limited protection under the Lanham Act, the Club Marks are strikingly similar to Plaintiff's Marks and any differences between them are insufficient to ward off consumer confusion.

### (3) Similarity of Services

■ To be "related" for the purposes of trademark law, conflicting goods or services do not have to be in direct competition with one another. Rather, the relevant question is whether they are so "related" that a reasonable buyer is likely to think that a defendant's goods or services are somehow connected with or sponsored by the plaintiff, due to similar marks. *Herbko Int'l, Inc. v. Kappa Books, Inc.,* 308 F.3d 1156 (Fed.Cir.2002) ("Even if the goods and services are not identical or specifically related in kind, they may be sufficiently related in the mind of the consuming public to cause confusion concerning the source or origin of the goods and services.").

■ Put otherwise, goods are "related" if customers are likely to think that the infringer's goods come from the same source as the senior user's goods or are sponsored by, affiliated with or connected with the senior user. *In re Save Venice New York, Inc.,* 259 F.3d 1346, 1355 (Fed. Cir.2001). For example, in *Giant Food, Inc. v. Nation's Foodservice, Inc.,* 710 F.2d 1565 (Fed.Cir.1983), the Federal Circuit held that fast-food hamburgers marketed under the "GIANT" mark were sufficiently related as to cause confusion with the "GIANT FOOD" mark used by supermarkets. Specifically, the court explained, "While we

recognize that the average consumer makes a distinction between fast-food restaurants and supermarkets, we are satisfied that, if the marks themselves are confusingly similar, customers of the fast food restaurant would be likely to believe that [the supermarket] owned, sponsored, or supplied that business." *Id.* at 1570.

Likelihood of confusion has also been found in cases involving "complementary" goods and services, even though some of these pairs of goods occupy fairly distinct market spaces insofar as the purchase of one does not necessarily implicate the other. *See, e.g., Fisons Horticulture, Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466 (3d Cir. 1994) (peat moss and fertilizer); *E & J Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280 (9th Cir.1992) (wine and cheese); *Octocom Sys., Inc. v. Houston Computer Servs., Inc.,* 918 F.2d 937 (Fed.Cir.1990) (computer programs and modems); *In re Martin's Famous Pastry Shoppe, Inc.,* 748 F.2d 1565 (Fed.Cir.1984) (bread and cheese); *Aunt Jemima Mills Co. v. Rigney & Co.,* 247 F. 407 (2d Cir.1917) (pancake batter and syrup).

Defendant argues that, even if its marks are similar to Plaintiff's, there is insufficient similarity between the services it offers to its members (seminars and training for triathlons and social events) and the triathlon itself, which is the product offered by Plaintiff; therefore, this factor ought to weigh in Defendant's favor. There are several flaws in this argument. One is that Plaintiff has provided evidence that it, like Defendant, also offers training services, albeit through a partnership with a local sports club (Reebok Sports Club/ NY). (Korff Decl. ¶ 36 & Ex. T). As part of Reebok's exclusive sponsorship deal, it offers triathlon-specific courses, including a "Triathlon Club," a six-month training program. Members of the Reebok Sports Club are given priority registration for the

New York City Triathlon. (*Id.* Ex. T.) Thus, some of the services offered by Plaintiff and Defendant are in fact similar.

Defendant urges this Court to draw a contrary conclusion based on its representation that it currently has no intention of "organizing" any triathlon but instead intends to dedicate itself solely to offering supporting services to triathletes (e.g., seminars, training for triathlons, social events). Specifically, Defendant urges this Court to conclude that, in the absence of intent to organize a race, Defendant's services cannot be considered similar to those offered by New York City Triathlon LLC (i.e., the New York City Triathlon). (*See* Vandaele Decl. ¶ 4; Def.'s Br. at 16–17.) Mr. Vandaele says that, in his experience, training clubs "do not also sponsor" races, and therefore, training clubs and races are inherently dissimilar and consumers would not be confused by two similarly-named entities. (Vandaele Decl. ¶ 17.) Defendant also provides affidavits from three different triathlon organizing entities in other cities, each of which attests that the race in its jurisdiction is unrelated to the club, even though the two entities share a similar name. (*See id.* Exs. 5–7.)

The Court does not find Defendant's arguments persuasive.

First, Mr. Vandaele appears to have forgotten that New York City's most famous road race, the New York City Marathon, is organized and operated by a training club (the New York City Road Runners). Consumers in this jurisdiction might well expect a club that shares a name with a race to be affiliated with the race of the same name—or at least interpret club training services to be similar or otherwise related to the race itself. Additionally, one regional organization refers to itself as a "club" (the aforementioned New York Triathlon Club) but organizes multi-sport events—a fact of which Mr. Vandaele must

be aware, since, as discussed below, he organizes a triathlon at Lake Sebago that takes place the day before a racing event that is organized by NYTC. (Honig Decl. ¶ 5.) Therefore, the fact that Defendant calls itself a "club" does not necessarily distinguish the services offered by the parties.

Second, in addition, whatever else might be true of Mr. Vandaele's experience with the relationship between races and training clubs, the fact remains that he has (through his retail store, SBR Multisports, Inc. ("SBR")) helped to organize or sponsor more than a dozen triathlons over the past five years, including the Plaintiff's race. (Honig Decl. ¶ 5 (Vandaele/SBR has organized triathlons at Lake Sebago in Harriman State Park during June and August for approximately three years); Vandaele Decl. ¶ 16 (SBR sponsored the New York City Triathlon for the years 2004–2008); Korff Decl. ¶ 31 (SBR sponsored the NYC Triathlon Club Championships from 2005–2008); Jakes Decl. ¶ 2 & Ex. B (Vandaele was "staging and publicizing" a race known as the "Iron Race NYC The Underground' ").)

Mr. Vandaele has been intimately involved in the New York City Triathlon and other events organized by New York City Triathlon LLC. Between 2005 and 2008, SBR actually sponsored the New York City Triathlon, and in exchange "was permitted to call itself the 'exclusive triathlon and bike retailer' " of the triathlon. (Korff Decl. ¶ 45.) During those same years, Mr. Vandaele (through SBR) also sponsored a race among members of the various triathlon clubs, which was organized by Plaintiff and was known as the "NYC Triathlon Club Championships." (*Id.* ¶ 31.) Thus, Mr. Vandaele is an active race organizer. Given his significant and ongoing relationships with various triathlons, what Mr. Vandaele has not told the Court about his

past relationship with Plaintiff and with race organizing makes him, to my mind, a less than credible witness.

This factor weighs in favor of Plaintiff.

### (4) Bridging the Gap

██ "The term 'bridging the gap' is used to describe the senior user's interest in preserving avenues of expansion and entering into related fields." *C.L.A.S.S, Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir., 1985). One court in this District has explained "bridging the gap" in the following way: "In the likelihood of confusion context, 'bridging the gap' refers to two distinct possibilities. The first is that the senior user presently intends to expand his sales efforts to compete directly with the junior user . . . . The second possibility is that, while there is no present intention to bridge the gap, consumers will assume otherwise and conclude, in this era of corporate diversification, that the parties are related companies." *Lambda Elecs. Corp. v. Lambda Tech., Inc.*, 515 F.Supp. 915, 926 (S.D.N.Y. 1981).

As explained above, New York City Triathlon LLC has undertaken to offer training services through its affiliation with Reebok Sports Club. Therefore, there is no gap to bridge in this case—both Plaintiff and Defendant are offering some of the same services. This factor favors Plaintiff.

### (5) Actual Confusion

The "actual confusion" factor inquires whether there is evidence of "consumer confusion that enables a seller to pass off his goods as the goods of another." *Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 963 (2d Cir.1996) (internal quotations and citation omitted).

Here, Defendant existed under the name "New York City Triathlon Club" for less than two months before New York City Triathlon LLC brought suit to enjoin the use of the junior mark. Plaintiff sent NYC Triathlon Club a cease and desist letter demanding that it discontinue use of the name on January 8, 2010, one week after the club renamed itself (effective January 1, 2010), and filed suit on February 22, 2010, to enforce its rights. *See New York City Triathlon*, 2010 WL 808885, at *2.

During the period when Plaintiff's and Defendant's Marks co-existed, there was one instance of actual confusion between the two. Richard Izzo, head of the Westchester Triathlon Club and organizer of the Westchester Toughman Half Iron Triathlon, testified that he received an email on December 23, 2009, from the NYC Triathlon Club announcing the prospective launch of the club. (Decl. of R. Izzo, Mar. 25, 2010 ("Izzo Decl.") ¶ 2 & Ex. B.) In response, he stated that he emailed John Korff as a representative of the New York City Triathlon to "ask him if he could add the Westchester Toughman Half Iron Triathlon" to "what I believed was his club's schedule." (*Id.* ¶ 3.) Mr. Izzo says that he was subsequently informed that the NYC Triathlon Club and NYC Triathlon were not affiliated. (*Id.* ¶ 4.)

While courts in this jurisdiction have held that a single instance of actual confusion is insufficient to find for the plaintiff under the "actual confusion" factor of the *Polaroid* test, *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 124 (2d Cir.2001), the test of infringement is the *likelihood* of confusion, not proof of *actual* confusion. A plaintiff need not prove any instances of actual confusion. *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1227 (2d Cir.1987). And as the Court explained in *Centaur*, where the parties were both in

the market for only a short time—in that case, four months—the lack of instances of actual confusion "is not especially significant." *Id.* at 1227.

In light of the fact that Plaintiff and Defendant's marks have co-existed for less than two months, and there has already been an instance of confusion, the Court concludes that the "actual confusion" factor favors neither party. I also give the "actual confusion" factor minimal weight.

### (6) Good Faith

In determining a defendant's intent, "actual or constructive knowledge" of the prior user's mark or dress may indicate an absence of good faith or bad faith. *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 259 (2d Cir.1987). In particular, where such prior knowledge is accompanied by similarities so strong that it seems plain that deliberate copying has occurred, the Second Circuit has upheld a finding of bad faith. *Id.* at 258–59. Put otherwise, where a junior user intentionally copies a mark, a presumption of bad faith arises. *Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 586 (2d Cir.1993). However, this presumption may be overcome by evidence that a defendant conducted a trademark search before using the mark, or that a defendant sought and relied on the advice of counsel—the mere fact that a defendant was aware of a plaintiff's mark is not necessarily inconsistent with a defendant's good faith. *See id.*

In this case, the presumption of bad faith is not overcome by so much as a scintilla of evidence. Mr. Vandaele concedes that he was aware of the New York City Triathlon and its mark as early as 2004, approximately six years before he adopted the Club Marks. (Vandaele Decl.

¶¶ 16, 22.) For at least four of those years, Mr. Vandaele's sporting goods store sponsored the New York City Triathlon race and was its "exclusive triathlon and bike retailer." (Korff Decl. ¶ 45.) Between 2005 and 2008, Mr. Vandaele's store also co-sponsored another race organized by Plaintiff, known as the "New York City Triathlon Club Championships." (*Id.* ¶ 31.) That name that is surprisingly similar to Defendant's chosen moniker given that Defendant purports not to have selected its name based on its proximity to Plaintiff's intellectual property.[1]

Further, on at least one occasion prior to renaming his triathlon club, Mr. Vandaele (through SBR) appears to have attempted to capitalize on the New York City Triathlon name by printing unauthorized and unlicensed "NYC Triathlon Finisher" t-shirts, which he was ultimately compelled to destroy when Plaintiff objected to the distribution of shirts bearing one of its marks. (Def.'s Br. at 20 (*citing* Vandaele Decl. ¶ 22).)

Mr. Vandaele attempts to rebut the presumption of bad faith by providing several reasons why he might have renamed SBR Triathlon Club the "New York City Triathlon Club" that have nothing to do with any attempt to trade off of Plaintiff's goodwill. These include that all of the club members are from New York City (Vandaele Decl. ¶ 17), that the club is based in New York City (*id.*), and that he needed to spin off the club from his retail operation so that he could sell the store without having to book the negative cash flows recorded by the club (*id.*). The Court rejects these reasons as pretextual.

I must assume, on this motion for a preliminary injunction, that Mr. Vandaele

---

1. One wonders when and how the relationship between Plaintiff and Mr. Vandaele and his store ended and whether changing the name of SBR's triathlon club is somehow related to that untold story.

is correct in his conclusion that SBR will be more attractive to potential buyers if any debts incurred by the affiliated triathlon club are removed from its books. (*Id.* ¶ 7.) But this has absolutely nothing to do whatsoever with the specific name Mr. Vandaele applied to his new club. Even taking at face value his desire to inform local triathletes of the location and purpose of the club (*id.* ¶ 12), there were a plethora of other names available to him that were not virtual replicas of Plaintiff's Marks. For example, he could have named the club the "Gotham" Triathlon Club, since "Gotham" (outside the context of *Batman*) is a name that is associated with only one place—New York City. The same could be said of "Big Apple Triathlon Club" or "Five Borough Triathlon Club" or maybe even "Manhattan Triathlon Club." However, I cannot and do not credit Mr. Vandaele's testimony about the reasons why he changed the name of his club. "SBR Triathlon Club" conveyed to potential members both the exact location of the club (Vandaele's store, which is where it began) and some approximation of its purpose (although if the purpose of the club is to help athletes train for triathlons, then one might expect to see the word "training" in the club's name). Mr. Vandaele has not testified that he conducted a trademark search to determine whether New York City Triathlon was a protected mark, nor did he testify that he consulted a lawyer for advice on whether "New York City Triathlon Club" might infringe upon one or more of Plaintiff's Marks. The Court finds it implausible that he chose Plaintiff's name for any reason other than to capitalize on the reputation of plaintiff's race.

In light of his failure to provide a creditable explanation for why he chose the "New York City Triathlon Club" mark, the Court finds that he has failed to rebut the presumption of bad faith arising from his actual knowledge of Plaintiff, its goodwill, sponsorship arrangements and marks.

### (7) Quality of Goods and Services

The "quality of goods and services" factor "generally considers whether the senior user's reputation could be tarnished by inferior merchandise [or services] of the junior user." *Cadbury Beverages, Inc. v. Cott Corp.,* 73 F.3d 474, 483 (2d Cir.1996) (internal quotations omitted). However, the comparative difference in the quality of the products offered by a plaintiff and defendant is one of the less probative factors in a determination of the likelihood of confusion. *Virgin Enters. Ltd. v. Nawab,* 335 F.3d 141, 151 (2d Cir. 2003). As the Second Circuit has explained, differing quality really goes more to the harm that confusion can cause than it does to the likelihood of confusion itself. *Id.* at 152.

Here, Plaintiff has presented evidence that Mr. Vandaele's products and services (as offered through his store, SBR) may be of questionable quality. That is, Plaintiff has recounted one instance where Mr. Vandaele attempted to distribute unauthorized NYC Triathlon t-shirts (Korff Decl. ¶ 46), another instance where he offered products for a charity raffle that the winner subsequently had difficulty collecting from SBR (*id.* ¶ 47), and yet another instance where Mr. Vandaele attempted to organize an "Iron Race" that may have infringed on the IRONMAN popular trademark (*id.* ¶ 53). By contrast, Mr. Vandaele has testified that he runs "one of the leading triathlon retailers in the country, if not the world," as evidenced by the many accolades SBR has received from industry publications and local media. (Vandaele Decl. ¶ 19.)

The problem with the testimony from both parties is that it does not provide any

information about the quality of the services provided by Mr. Vandaele's triathlon *club*. This factor of the *Polaroid* analysis addresses the quality of goods and services provided by junior user—not any loosely related entities. Mr. Vandaele's "New York City Triathlon Club" operated as such for only a brief period of time, between January and March 2010, and the Court does not even know whether the club organized any training events during that period. So this factor is at most neutral, and in any event, not helpful to the analysis. *See De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, 440 F.Supp.2d 249, 279 (S.D.N.Y.2006) (single product sale provided insufficient basis for court to assess quality of goods and factor was therefore neutral).

#### (8) Sophistication of Consumers

The last *Polaroid* factor—the inquiry into consumer sophistication—"considers the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 390 (2d Cir.2005) (internal quotations and citation omitted).

Consumers in this case range from elite professionals to amateurs looking to compete in their first triathlon. The record reflects that a majority of registrants for the 2010 NYC Triathlon have identified themselves as first time triathletes. (Korff Decl. ¶ 11 (56% of registrants are first time triathletes).) These consumers are properly considered unsophisticated buyers, for whom confusion is especially likely. *See Guiness United Distillers & Vintners B.V. v. Anheuser–Bush, Inc.*, No. 02 Civ. 0861, 2002 WL 1543817, at *6 (S.D.N.Y. July 12, 2002) ("unsophisticated

buyers increase the likelihood of confusion").

Moreover, in this case, one highly sophisticated consumer, Richard Izzo, head of the Westchester Triathlon Club and organizer of the Westchester Toughman Iron Triathlon, was confused about the relationship between the NYC Triathlon and the NYC Triathlon Club. (Izzo Decl. ¶ 3–4.) Given his familiarity with the triathlon business, Mr. Izzo's confusion suggests that a range of consumers would be confused by the similarities between Plaintiff's and Defendant's marks. Accordingly, this factor weighs in favor of Plaintiff.

#### C. Weighing the Polaroid Factors

Having entered findings as to each *Polaroid* factor, the Court must determine what weight to give to each. The Second Circuit has counseled that "no single *Polaroid* factor is determinative," *Plus Prods. v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1004 (2d Cir.1983), but the first three factors are "perhaps the most significant," *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987). Those are: strength, similarity of the marks and closeness of the goods or services. Additionally, the absence of certain factors (alone or in combination), including instances of actual confusion and evidence that an infringer's goods are of inferior quality, does not automatically mean there is no likelihood of confusion. *Id.* at 259–60 (absence of intent to "bridge the gap" and quality of infringer's goods); *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1227 (2d Cir.1987) (absence of actual confusion). Finally, the list of *Polaroid* factors does not exhaust the possibilities—the Court is still at liberty to take additional variables into account. *Physicians Formula Cosmetics, Inc. v. West Cabot Cosmetics, Inc.*,

857 F.2d 80, 85 (2d Cir.1988) (citation omitted).

As explained above, the Court finds that the first three factors of the *Polaroid* test favor Plaintiff. Although Plaintiff's mark is descriptive and is therefore entitled to limited protection under the Lanham Act, it is nevertheless entitled to some protection. And given the similarity of the marks and the closeness of the goods and services offered by Plaintiff and Defendant, the Court concludes that these three factors weigh strongly in favor of a finding of likely confusion between the marks. Further, as to the fourth factor, there can be no question about Defendant's intent to bridge the gap, since both Plaintiff and Defendant offer overlapping services (triathlon training). And both the bad faith and sophistication of consumers factors weigh overwhelmingly in favor of Plaintiff.

While the Court is aware of only a single instance of confusion between Plaintiff's and Defendant's marks, the paucity of evidence of actual confusion is offset by the fact that the two marks co-existed only for a short period—just two months. Therefore, I accord little weight to actual confusion as a *Polaroid* factor. Similarly, as explained above, the comparative quality of services factor is not helpful in determining the likelihood of confusion between the marks because the Court has insufficient data to make a determination on this point.

Accordingly, the Court finds that the *Polaroid* factors compel a finding of a likelihood of confusion between Plaintiff's and Defendant's marks.[2]

## III. Irreparable Harm

Courts in this Circuit have often applied a presumption of irreparable harm upon a finding that a plaintiff was likely to succeed on the merits of his claim in a trademark infringement action. *See, e.g., Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 246–47 (2d Cir.2009); *Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137 (2d Cir.2005); *see also Syler v. Woodruff*, 610 F.Supp.2d 256, 262–63 (S.D.N.Y.2009). However, the Second Circuit's recent decision in *Salinger v. Colting*, 607 F.3d 68 (S.D.N.Y.2010), calls into question the propriety of that presumption, insofar as the *Salinger* court held that the analogical presumption of irreparable harm in copyright infringement actions was inconsistent with the standard for injunctive relief pronounced in *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). *See Salinger*, 607 F.3d at 74–75.

The *Salinger* court explained that its holding was limited to the copyright context, *id.* at 78 n. 7, but this Court can find no principled basis on which to distinguish copyright from trademark infringement actions. Accordingly, and without deciding whether *eBay* also alters the presumption of irreparable harm in the context of a trademark infringement action, this Court applies *Salinger*'s articulation of the standard for injunctive relief. Since the showing required under *Salinger* is stronger than the pre-*Salinger* standard, because a plaintiff must make an independent showing of irreparable harm, a plaintiff who discharges his burden under *Salinger* does so under any standard.

---

**2.** Because the Court finds that Plaintiff is likely to succeed on the merits of its Lanham Act infringement claim, the Court does not revisit its previous analysis of Plaintiff's likelihood of success on its other claims under the Trademark Dilution Revision Act of 2006, Anticybersquatting Consumer Protection Act or New York State law. *See* March 9, 2010 Decision and Order.

Plaintiff in this case has presented the Court with sufficient evidence to support an independent finding of irreparable harm. Plaintiff has invested substantial effort into making the NYC Triathlon financially successful and well-known as a premiere international racing event. (Korff Decl. ¶¶ 25, 38.) Plaintiff has amassed substantial goodwill and a very favorable reputation during its ten years of operation (*id.* ¶ 28), which will suffer if Defendant is allowed to continue using its Club Marks. Among other things, the Court finds it likely that consumers will believe (erroneously) that signing up for Defendant's club will offer them an advantage in signing up for the New York City Triathlon itself, as is the case with the relationship between the New York Road Runners Club and the New York City Marathon. (*See* Supplemental Decl. of J. Korff, Mar. 26, 2010, ¶ 3.) Plaintiff has also testified that the likelihood of confusion between the marks is likely to further undermine its goodwill by making it more difficult for Plaintiff to secure sponsors for the 2011 race (*id.*), and has suggested that it is likely to compromise its relationship with Reebok, since Reebok currently operates the only authorized club affiliated with the race (Korff Decl. ¶ 37). Prospective loss of this goodwill alone is sufficient to support a finding of irreparable harm. *See Tom Doherty Assoc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37–38 (2d Cir.1995) (noting that "a loss of prospective goodwill can constitute irreparable harm").

Moreover, by misappropriating Plaintiff's marks, Defendant is not only trading on Plaintiff's earned goodwill but is also taking from Plaintiff the ability to control its reputation and the services offered under its name and mark. Irreparable harm "exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial," because loss of control over one's reputation is neither "calculable nor precisely compensable." *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985). Here, Plaintiff has come forward with evidence indicating that it is operating in the same market space as Defendant through its affiliation with Reebok, through which it operates a training club. (Korff Decl. ¶ 36.) For obvious reasons, these two clubs could be easily confused. During the brief period that Plaintiff and Defendant co-existed, at least one consumer—a highly sophisticated consumer—actually did confuse Defendant's club with the New York City Triathlon. (Izzo Decl. ¶ 4.) Further, Plaintiff has submitted a declaration from the organizer of the Los Angeles Triathlon, who testified that his organization has coexisted alongside the Los Angeles Triathlon Club, which has led to significant confusion by vendors and sponsors. (Caress Decl. ¶ 8.)

Defendant disputes none of these facts. Rather, Defendant claims that *it* will be irreparably harmed if it is not allowed to continue using the New York City Triathlon Club mark, as evidenced by the fact that some club members have sought refunds of dues since this Court first entered its preliminary injunction. (Vandaele Decl. ¶ 26–27.)

While harm to the Defendant is wholly irrelevant to the Court's analysis of potential irreparable harm facing the plaintiff in the absence of injunctive relief-the balance of hardships constituting a separate category of analysis, *see Salinger*, 607 F.3d at 79–80—the Court also notes that Defendant has provided no explanation about the reason why people wanted their money back. I can speculate, however, that members might have joined the New York City Triathlon Club because they thought the club was affiliated with Plaintiff's race, and sought refunds when they realized (thanks

to publicity about this lawsuit) that it was not. Were that the case, it would be strong evidence of actual consumer confusion, which supports this Court's findings of both likelihood of success on the merits and of irreparable harm.

## IV. Balance of Hardships

The balance of hardships in this case clearly favors Plaintiff. As explained above, Plaintiff faces the threat of irreparable harm absent injunctive relief. Defendant alleges that it too will suffer irreparable harm if this Court's injunction is not vacated; however, none of the testimony it has presented to the Court warrants such a finding. Defendant only used the name "New York City Triathlon Club" for approximately two months, which is not enough time for Defendant to have established a reputation or significant presence in the relevant market. Defendant has submitted no evidence that the SBR Triathlon Club has been widely known under its new name in that brief period.

Defendant alleges that the balance of hardships tips in its favor because this is an especially crucial time of year for marketing, since east coast triathlon season is May–November, and therefore potential participants are looking to join a training club now. (Vandaele Decl. ¶¶ 26, 28.) If true, this fact weighs in Plaintiff's favor, not Defendant's, since Plaintiff is affiliated with a training club, whose reputation and business are likely to be undercut by Defendant's continued use of its nearly identical marks. This Court's injunction does not prohibit Defendant from operating a training club or recruiting members during this training season—only from doing so under marks that infringe upon Plaintiff's rights.

Defendant also alleges that the lawsuit has "caused our members and prospective members to become nervous about the viability of the NYC Triathlon Club," has caused at least one Board Member to resign because "she was particularly concerned that the Club did not have a name" (*id.* ¶ 27), and has allegedly created a generally "negative feeling about the Club" (*id.* ¶ 29). Defendant has presented the Court with neither the names of any of these members, prospective members or the concerned Board Member, nor with affidavits or other competent testimony from any of these individuals. Additionally, as noted above, this Court's injunction does not prohibit Defendant from operating a training club. It only prohibits Defendant from operating a training club using the name that infringes upon Plaintiff's Marks. For the reasons already stated, the fact that some members have sought refunds, without any additional information, does not provide the Court a sufficient basis to conclude that the Defendant is being harmed by a wrongfully-granted preliminary injunction, as opposed to because of its own misconduct, which has created confusion in the minds of potential members. Therefore, the Court finds that the balance of hardships tips decidedly for the Plaintiff.

## V. The Public Interest

Having concluded that all other factors favor injunctive relief, the Court's sole remaining task is to confirm that granting injunctive relief would not disserve the public interest. *See Salinger,* 607 F.3d at 79–80. In this case, the public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality. *SK & F, Co. v. Premo Pharm. Labs., Inc.,* 625 F.2d 1055, 1067 (3d Cir.1980); *accord Nat'l Rural Elec. Co-op Ass'n v. National Agr. Chemical Ass'n,* 26 U.S.P.Q.2d (BNA) 1294, 1299 (D.D.C.1992) (the public inter-

est lies in avoiding confusion, particularly where defendant would be able to continue its activities under another mark). Accordingly, the public interest would not be disserved by this Court's injunction, and the Court finds that all factors favor injunctive relief.

## VI. Posting of a Bond

Defendant has requested this Court require Plaintiff to post a bond in the event that the injunction is not vacated. It is well-settled that a district court has "wide discretion in the matter of security and it has been held proper for the court to require no bond where there has been no proof of likelihood of harm." *Doctor's Associates, Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir.1996) (internal quotations and citation omitted). In this case, Defendant has not demonstrated it will likely suffer any harm absent the posting of a bond, and the likelihood of success on the merits is overwhelming. Therefore, the Court declines to require one.

## VII. Modification of Injunction Terms

Defendant also asks the preliminary injunction be modified by a Court order "permit[ting] us to have the old nyctriclub.com domain name redirected to the new domain name for a period of six weeks so that members and prospective members can find us." (Vandaele Decl. ¶ 28.) Defendant offers to dispel any confusion with a disclaimer that would advise readers that it was not affiliated with the race. (*Id.*)

That request is denied. To permit Defendant to continue to use Plaintiff's mark to direct people to Defendant's new site is exactly what a preliminary injunction is designed to prevent: it would allow Defendant to continue to trade directly on Plaintiff's goodwill.

## VIII. Defendant's Violations of the Injunction

Since this Court first entered a preliminary injunction in this case, Plaintiff has notified the Court of what it believes to comprise several violations of this Court's order. Each is detailed below.

First, Plaintiff has notified the Court that in response to the Court's preliminary injunction order and its direction at the hearing to "come up with a different name," (Hearing Tr., Mar. 9, 2010, at 7), Defendant has switched the order of its moniker from NYC Triathlon Club to "Triathlon Club NYC," continuing to use the same background graphic as before (the New York Cityscape plus a stylized orange headshot of the Statue of Liberty). In defense of its choice, Defendant argues that the "safe distance rule," which requires it to pick a new name that is a safe distance from Plaintiff's NYC TRIATHLON Marks, is not applicable to it because it has only been preliminarily enjoined. However, the Second Circuit has affirmed the application of the "safe distance" rule in the preliminary injunction context. *See Oral–B Labs., Inc. v. Mi–Lor Corp.,* 810 F.2d 20, 24 (2d Cir.1987), *superseded on other grounds by Paddington Corp. v. Attiki Imps. & Distribs., Inc.,* 996 F.2d 577, 585 (2d Cir.1993).

"The test of consumer confusion is not whether the products can be differentiated when subjected to a side-by-side comparison, but rather whether they create the same general overall impression." *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1060 (2d Cir.1979). In this context, a reversal of syllables or words from another's mark can result in a mark that is still confusingly similar. *See, e.g., Maternally Yours v. Your Maternity Shop, Inc.,* 234 F.2d 538 (2d Cir.1956) (MATERNALLY YOURS confusingly similar to YOUR MATERNITY SHOP); *Home Shopping Club,*

*Inc. v. Charles of the Ritz Group, Inc.,* 820 F.Supp. 763 (S.D.N.Y.1993) (ESSENCE OF TIME confusingly similar to TIMELESS ESSENCE); *Bank of Am. Nat'l Trust and Sav. Assoc. v. The Am. Nat'l Bank of St. Joseph,* 201 U.S.P.Q. 842 (T.T.A.B.1978) (AMERIBANC confusingly similar to BANK OF AMERICA); *In re Nationwide Indus., Inc.,* 6 U.S.P.Q.2d 1882 (T.T.A.B.1988) (RUST BUSTER confusingly similar to BUST RUST); *Plus Prods. v. Physicians Formula Cosmetics, Inc.,* 198 U.S.P.Q. 111 (T.T.A.B.1978) (PLUS FORMULA confusingly similar to FORMULA PLUS). That is exactly what has happened in this case. Defendant's selection of "Triathlon Club NYC" is not a sufficiently safe distance from Plaintiff's names and marks, especially in light of the fact that Defendant's new mark uses the same graphics as its old mark, and those graphics make the geographical portion of its mark ("NYC") a dominant feature. Thus, even if "Triathlon Club NYC" could, under some circumstances, be considered sufficiently different from "NYC Triathlon," the fact remains that the design portion of Defendant's new mark simply underscores the "NYC" reference, which the Court finds is likely to cause confusion with the Plaintiff's NYC TRIATHLON Marks, especially in light of the other similarities between the two organizations. Therefore, Defendant's new name violates the spirit and letter of the Court's March 9, 2010 Decision and Order, and Defendant is ordered to immediately refrain from using this name.

Second, Defendant is also ordered to immediately refrain from using infringing marks on its site and all other webpages within its control, such as, but not limited to, its Facebook, Twitter, and Linkedin pages. Defendant informs the Court that it has declined to "totally deactivate," inter alia, its Twitter account, on the ground that it wishes to wait until the close of the litigation in this case before giving up its "nyctriclub" handle (username). (Vandaele Decl. ¶ 33.) Defendant's actions with respect to its Twitter account violate the express terms of this Court's order, which enjoined Defendant from using any and all of Plaintiff's marks. The fact that Defendant is not accepting additional "followers" on its "nyctriclub" Twitter account and has "protected" its "tweets" (rendered them private) (*id.*), does not alter the fact that Defendant's "nyctriclub" account is publicly viewable and patently in violation of the terms of the injunction. Defendant is ordered to remove any reference to "nyctriclub" or any of Plaintiff's Marks or anything similar from all websites, social networking sites and other forms of electronic media.

Third, Plaintiff notified the Court, on April 20, 2010, that Defendant had appeared at the Multisport World Conference and Expo under the name "New York City Triathlon Club" on April 18, 2010. (Decl. of V. Brumfield, Mar. 25, 2010 ("Brumfield Decl.") ¶¶ 3–4.) Defendant appeared both in the expo's program as "New York City Triathlon Club" and occupied a booth at the fair under a sign reading "New York City Triathlon Club." (*Id.* & Exs. A–B.) This is also a violation of the injunction.

In response, Defendant states that it signed up for the event in February as "New York City Triathlon Club," before this Court issued its injunction prohibiting use of that name. (Decl. of L. Rekas, Apr. 20, 2010 ("Rekas Decl.") ¶ 3.) Defendant states that, in an attempt to ensure that the enjoined name would not appear at the expo, it sent an email to the event's organizers requesting that Defendant's name appear as "Triathlon Club NYC" on April 12, 2010, but by the time the organizers received its email the program had already been printed. (*Id.* ¶ 4.)

This excuse does not justify Defendant's failure to comply with the Court's order. Even though Defendant was aware that it had signed up for the event under a name it was subsequently enjoined from using, Defendant waited more than one month after this Court issued its injunction on March 9, 2010, before notifying the event's organizers of its name change. Defendant argues that it should not be held liable for violating the terms of the injunction as a result of the sign that was displayed at its booth because it "did not prepare the sign and had no idea that a sign would even be provided," "the sign was small and located high above the booth," and "it would have been difficult to reach without a step stool or ladder." (*Id.* ¶ 6.) This is simply ludicrous. Defendant does not state or otherwise suggest that it made any attempt to have the sign removed, including among other infinitely reasonable possibilities, asking the event organizers to remove the sign (or to lend the club a step stool, which someone surely used to hang the sign in the first place). Moreover, Plaintiff states that several organizations attending the event managed to replace their event-issued signs with "bigger and/or more colorful logo-based signs" (Brumfield Decl. ¶ 4), which suggests that removal or obfuscation of the sign was within the purview of the New York City Triathlon Club. The club's failure to take any action to attempt to have the sign removed was in direct violation of this Court's order,

### CONCLUSION

The Defendant's motion to vacate the preliminary injunction is denied. Plaintiff's motion to enjoin Defendant from any further violations of that injunction is granted. Defendant has until Friday, May 7, 2010, at 5pm EST to remedy any violations of the terms of this Court's injunction. If Defendant has not done so by that time, this Court will not hesitate to hold Defendant in contempt.

This constitutes the decision and order of this Court.